**UNITED STATES of America, Plaintiff–Appellee,**

v.

**$448,342.85, et al. (J.M. Distributors and Westmont Corporation, Claimants), Defendants–Appellants.**

**Nos. 91–2912, 91–2913, 91–3159 and 91–3160.**

United States Court of Appeals, Seventh Circuit.

Argued July 7, 1992.

Decided July 29, 1992.

Elizabeth M. Landes, Asst. U.S. Atty., (argued) Office of U.S. Atty., Crim. Div., John S. Brennan, Asst. U.S. Atty., Office of

U.S. Atty., Civ. Div., Appellate Section, Chicago, Ill., for plaintiff-appellee U.S.

Jeffrey B. Steinback, Genson, Steinback, Gillespie & Martin, Donald J. Moran, Bruce E. de'Medici, Gregory N. Kazarian, Pedersen & Houpt, Chicago, Ill., for defendant Four Hundred Forty-Eight Thousand Three Hundred Forty Two Dollars and Eighty Five Cents.

Jeffrey B. Steinback, Marc W. Martin, Leonard Goodman (argued), Genson, Steinback, Gillespie & Martin, Chicago, Ill., for appellants J.M. Distributors and Westmont Corp.

Before CUDAHY, COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Competition among sellers, coupled with bargain-hunting by buyers, leads to prices that protect ignorant, lazy, or busy customers. Comparison shopping by even a fairly small portion of potential customers drives prices to the level reflecting full information about goods of their quality.[*] Because buyers know this effect, if only hazily, sellers try to persuade them that they need not shop. "Look what knowledgeable people pay!" is the sales pitch. All to the good, if the claim be true; sometimes, however, the come-on is too good to be true.

Brothers Gary, Thomas, Robert, and Ray Sophie teamed up with Thomas McGough to exploit customers' belief that any price less than savvy people pay is a bargain. McGough and the Sophies formed Network Sound, Inc., to make, and Westmont Corporation and J.M. Distributors to sell, stereo speakers in the United States, Canada, and Australia. Although Network Sound manufactured the speakers for about $36 per pair, Westmont and J.M. were able to unload them for between $200 and $500 to gullible souls, raking in some $24 million

during 1988 and half of 1989. Network Sound packed the speakers in unmarked boxes. Then Westmont or J.M. loaded them into unmarked trucks, which driver-salesmen took cruising in search of marks. After pulling into a driveway or parking lot, the drivers would feign delivery of speakers to nearby stores or taverns. To onlookers, the drivers would explain that the warehouse had mistakenly loaded too many of these fancy speakers into the trucks. Anyone who seemed interested in taking the "excess" off the drivers' hands would be shown literature touting the quality of the speakers or "power invoices" purporting to show actual sales at high prices. Some customers must have been impressed with the glowing verbal descriptions, others with the invoices seeming to show what commercial buyers at ritzy establishments had paid, and still others must have concluded that unmarked boxes in unmarked vans were stolen and hence deeply discounted. Buyers paid cash, received trash, and had no clue where to complain.

Salesmen deposited the money in the organization's local bank accounts, where it was pooled for transfer to other accounts, often via cashiers' checks of less than $10,000. Further transfers routed the money to the three corporations at the pinnacle, which filed few currency transaction reports despite receiving millions in currency. Eventually the Sophies, McGough, and the three corporations pleaded guilty to conspiring to commit mail and wire fraud and "launder" the proceeds. The United States froze the balances in the corporations' principal accounts—about $750,000 in the name of Network Sound, $450,000 for J.M. Distributors, and $205,000 for Westmont. Invoking 18 U.S.C. § 981, the United States demanded forfeiture of these sums, which it depicted as proceeds of the fraud. The district court granted summary judgment

---

[*] See Alan Schwartz & Louis L. Wilde, *Intervening in Markets on the Basis of Imperfect Information: A Legal and Economic Analysis*, 127 U.Pa. L.Rev. 630 (1979); Schwartz & Wilde, *Imperfect Information, Monopolistic Competition, and Public Policy*, 72 Am.Econ.Rev. 18 (Pap. & Proc. 1982); Schwartz & Wilde, *Product Quality and Imperfect Information*, 52 Rev.Econ.Stud. 251 (1985); David M. Grether, Schwartz & Wilde, *The Irrelevance of Information Overload: An Analysis of Search and Disclosure*, 59 S.Cal. L.Rev. 277 (1986). Cf. George J. Stigler, *The Economics of Information*, 69 J.Pol.Econ. 213 (1961), reprinted in *The Essence of Stigler* 46 (Kurt R. Leube & Thomas Gale Moore eds. 1986).

against J.M. and Westmont, 1991 WL148186, 1991 U.S.Dist. Lexis 10367 (N.D.Ill.), entering a partial final judgment under Fed.R.Civ.P. 54(b). (Network Sound is a debtor in bankruptcy, and the district judge has bucked questions concerning that firm to the bankruptcy judge while retaining control of the account.)

Section 981(a)(1)(A) provides that "[a]ny property ... involved in a transaction or attempted transaction in violation of ... section 1956 ... of this title, or any property traceable to such property" is forfeit, unless the claimant satisfies the "innocent owner" defense of § 981(a)(2). Section 1956(a)(1) in turn makes it criminal when a person, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—(A)(i) with the intent to promote the carrying on of specified unlawful activity; or ... (B) knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law". Finally, § 1956(c)(7)(D) defines "specified unlawful activity" to include mail and wire fraud. Counsel for the government submits that the money it seized represents proceeds of the fraud and that Westmont and J.M. Distributors used their accounts with both the forbidden intent (§ 1956(a)(1)(A)(i)) and the prohibited designs (§ 1956(a)(1)(B)(i) and (ii)).

■ Westmont and J.M. Distributors concede this much—concede, indeed, that their guilty pleas establish it—but deny that sums seized in September 1989 can be traced to a fraudulent scheme that they insist ended late in 1988. Although the three corporations had no business other than the manufacture and sale of speakers, they say that their 1989 sales were honest. The indictment to which they pleaded guilty charged that the conspiracy lasted through August 1989, but a judgment based on a guilty plea forecloses only those issues *necessarily* determined. *Appley v. West*, 832 F.2d 1021, 1026 (7th Cir.1987). The terminal date of the conspiracy was not a necessary element of their convictions. When pleading guilty, the Sophies and McGough said that they cleaned up their acts by early 1989. Because the pleas do not settle the issue, the claimants contend, there must be a trial in the forfeiture action.

■ Shooting for the moon, the United States insists that it matters not whether the balances in the accounts may be traced to "specified unlawful activity". The accounts were "involved in" the fraud during 1988, and that is that. This approach treats the accounts as the criminals, taking the concept of deodands one step further (an account is not even a tangible object). Bank accounts do not commit crimes; people do. It makes no sense to confiscate whatever balance happens to be in an account bearing a particular number, just because proceeds of crime once passed through that account. Suppose Westmont abandoned the speaker business at the end of 1988, sent the balance to the victims as restitution, and used the same account (replenished from an untainted source) to buy and sell Treasury bills. That the "account" had been "involved" in the fraud would be irrelevant; the government confiscates the *funds*, not the account. Recall that § 981 authorizes forfeiture of "[a]ny *property* ... involved in a transaction or attempted transaction in violation of ... section 1956" (emphasis added). An "account" is a name, a routing device like the address of a building; the money is the "property". Once we distinguish the money from its container, it also follows that the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water. To the extent *United States v. Certain Funds on Deposit in Account No. 01-0-71417*, 769 F.Supp. 80, 84–85 (E.D.N.Y.1991), and *United States v. All Monies ($477,048.62) in Account No. 90-3617-3*, 754 F.Supp. 1467, 1472–76 (D.Hawaii 1991), treat the account as the

"property" for purposes of § 981, we disapprove their holdings.

Only property used in or traceable to the "specified unlawful activity" is forfeit. Money need not be derived from crime to be "involved" in it; perhaps a particular sum is used as the bankroll facilitating the fraud. That is not the United States' theory here, however; it treats these balances as proceeds. It is easy to imagine difficult problems in associating proceeds with crime. The law of trusts supplies an elaborate set of tracing rules, see *Restatement (2d) of Trusts* § 202 (1959); *Restatement of Restitution* § 212 (1937), but rules designed to adjust accounts between (apparently) honest persons are not suited to frauds in which funds have been shuffled at least in part for the purpose of disguising their source. Section 981(d) incorporates the provisions of the customs laws, including the rule that a showing of probable cause shifts the burden to the claimant. *United States v. On Leong Chinese Merchants Association Building*, 918 F.2d 1289, 1292 (7th Cir.1990) (parallel provision in 18 U.S.C. § 1955(d)); *United States v. Edwards*, 885 F.2d 377, 389–90 (7th Cir. 1989) (21 U.S.C. § 881(a)(6)). Probable cause to believe that the proceeds of the fraud exceed the balance of the account at the time of seizure justifies calling on the claimant to identify sums derived from lawful activities. Cf. *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1157–62 (2d Cir.1986) (discussing appropriate tracing presumptions when the balance exceeds the proceeds of crime).

Even if the fraud stopped at the end of 1988, the criminal proceeds vastly exceed the sums on deposit at the time of the seizure. J.M. Distributors and Westmont had only one line of business: selling speakers. Although eleven affidavits filed in this case assert that by the end of 1988 the Sophies had told their salesmen to phase out the use of "power invoices", and another three that power invoices were not used during 1989, none of the affiants says that the firms barred the other fraudulent sales techniques (or, for that matter, that the claimants started making complete currency transaction reports). Abandoning

one deceitful device among a large repertory does not make the operation lawful. Drawing all inferences in favor of the persons opposing the motion for summary judgment does nothing to help these claimants. Details of tracing are accordingly irrelevant; the United States is entitled to the entire balances.

AFFIRMED.