UNITED STATES of America

v.

ONE PARCEL OF REAL PROPERTY WITH BUILDINGS, APPURTENANCES AND KNOWN AS 170 WESTFIELD DRIVE, LOCATED IN THE TOWN OF EAST GREENWICH, RHODE ISLAND; Advest Account No. 323–02342 (Formerly 230–29291); Advest Account No. 323–02330; and Advest Trust Account No. 60–30–8220–39–2.

Civ. A. No. 95–0135L.

United States District Court,
D. Rhode Island.

Jan. 11, 1999.

Michael P. Iannotti, U.S. Attorney's Office, Providence, RI, for plaintiff.

Edward J. Goddard, Warwick, RI, for Advest Accounts.

Jeffrey C. Schreck, Providence, RI, for Kathleen and David Rehm.

### DECISION AND ORDER

LAGUEUX, Chief Judge.

Robert Catallozzi was a crook of major proportions, and this case is a legacy to his avarice. Over several years, Catallozzi stole more than $1.6 million from the United States Postal Service, where he was Supervisor of Accounting Services in the Providence office.

The United States filed this suit March 13, 1995 to take possession of the defendant bank accounts, which it alleges contains proceeds directly traced to Catallozzi's crimes, and the defendant real property (the "Westfield Drive property"), which it alleges was purchased with similar funds. The claimants, Kathleen and David Rehm ("the Rehms") allege that they own the real estate and those accounts. Kathleen Rehm was married to Catallozzi until 1991 when they were divorced. She married David Rehm thereafter and provided all or substantially all the money to purchase the Westfield Drive property. The Rehms' basic contention in this case is that they had no knowledge of Catallozzi's thievery.

That thievery was detailed by the late Magistrate Judge Timothy M. Boudewyns in his Report and Recommendation based on a statement of agreed facts submitted by the parties. These facts are recounted below.

The case is before this Court on cross motions for summary judgment. In the Claimants' Memorandum With Respect To The Court's Desire To Clarify Certain Legal Issues (the "Memorandum"), the Rehms argue that the suit is barred by the applicable statute of limitations. In Plaintiff's Reply to Claimants' Memorandum (the "Reply"), the United States argues that the Rehms lack standing to pursue their claim. Judge Boudewyns filed a Report and Recommendation on February 9, 1996 that suggested denial of both motions. Senior Judge Raymond Pettine (to whom the case was then assigned) put aside Judge Boudewyns' opinion choosing not to consider the issues raised therein. Instead he held a jury trial which resulted in a verdict of forfeiture. Claimants filed a motion for new trial, but Judge Pettine retired before considering it. Thereafter the case was assigned to this writer. After reading all the material in the file, including the transcript of the trial, this Court granted the motion for new trial, reinstated the Report and Recommendation and the objections thereto, and concluded that the issues raised thereby should be resolved before proceeding further. This Court now reviews the Report and Recommendation de novo.

For the reasons outlined below, this Court adopts Judge Boudewyns' recommendation (although the reasoning may differ in some particulars) and denies both motions for summary judgment. The Court also denies the Rehms' request to limit the potential forfeiture to the amount of money stipulated in Catallozzi's criminal case.

### I. Facts

During the period from December 1987 to about April 19, 1994, Catallozzi used his position as Supervisor of Accounting Services at the Providence, Rhode Island office of the United States Postal Service to steal, among other things, 39 U.S. Treasury checks totaling over $1.6 million. Catallozzi deposited most of the checks into a checking account numbered 0002 546513 entitled "CATS EMP, INC." at the Rhode Island Hospital Trust National Bank. Catallozzi was at all times able to sign checks on this CATS EMP, INC. account. During the period that the claimant, Kathleen Rehm was married to Catallozzi, she also had signatory authority on this account.

On December 19, 1994, Catallozzi pled guilty to a two count Information charging him with embezzlement of United States funds in violation of 18 U.S.C. § 641 and money laundering in violation of 18 U.S.C. § 1957. Catallozzi was the only individual criminally charged in connection with these offenses.

### A. The Catallozzi Marriage and CATS EMP, INC.

From 1985 through 1990, when Catallozzi and Kathleen Rehm permanently separated prior to their 1991 divorce, Kathleen Rehm, was the President and a Director of CATS EMP, INC., which is a Rhode Island corpo-

ration. That corporation was used by Catallozzi to deal in real estate and to invest in various businesses.

On August 12, 1988, Catalozzi and Kathleen Rehm, who were then married, purchased land located at 5 Osprey Drive (formerly 1065 High Hawk Road) East Greenwich, Rhode Island, for the purpose of constructing a single family home. The contractor for the project was Par Lab Industries. Catallozzi stole a U.S. Treasury check which he dated August 11, 1988 and made payable in the amount of $145,000 to real estate attorney James Vespia. Four days later the land was purchased by Catallozzi and Kathleen Rehm for the $145,000 transferred to Vespia.

Between July 6, 1988 and April 26, 1990, 32 United States Treasury checks totaling $1,082,742.74, made payable to various fictitious entities were stolen by Catallozzi, endorsed, and deposited into the CATS EMP, INC. account numbered 0002546513 at the Rhode Island Hospital Trust National Bank. A review of the deposits to the CATS EMP, INC. account indicates that stolen United States Treasury checks constituted more than 80% of the total deposits to that account. Funds for the construction of the Catallozzi house at 5 Osprey Drive came from this CATS EMP, INC. account. During this period, the deposits of the individual stolen checks were greater in amount than the checks subsequently issued for the construction. Between February 10, 1989 and April 4, 1990 the following checks totaling $581,229.86 were issued from the CATS EMP, INC. account and were used for various costs associated with the construction: Checks issued out of the CATS EMP INC. account by Robert Catallozzi:

| Date | Payee | Amount |
| --- | --- | --- |
| 02/10/89 | Par Lab Industries, Inc. | $118,966.09 |
| 02/27/89 | Par Lab Industries, Inc. | 141,793.03 |
| 04/12/89 | Par Lab Industries, Inc. | 72,185.51 |
| 06/12/89 | Par Lab Industries, Inc. | 66,826.00 |
| 08/10/89 | Par Lab Industries, Inc. | 32,124.00 |
| 08/12/89 | Par Lab Industries, Inc. | 925.00 |
| 09/02/89 | Par Lab industries, Inc. | 42,340.33 |
| 09/02/89 | RPM Enterprises | 4,000.00 |
| 10/17/89 | RPM Enterprises | 13,500.00 |
| 10/17/89 | Ray Limoges Landscaping | 16,000.00 |
| | Colonial Plmbg & Htg Co. | 3,920.00 |
| 11/06/89 | RW Limoges, Inc. | 18,100.00 |
| 11/17/89 | RW Limoges, Inc. | 13,790.40 |
| | Colonial Plmbg & Htg Co. | 20,415.00 |
| 12/06/89 | RW Limoges, Inc. | 1,666.50 |
| 04/04/90 | Limoges, Ray | 4,166.00 |

Checks issued out of the CATS EMP, INC. account by Kathleen Rehm:

| Date | Payee | Amount |
| --- | --- | --- |
| 04/06/90 | RW Limoges, Inc. | 4,166.00 |
| 04/13/90 | RW Limoges, Inc. | 2,975.00 |
| 04/19/90 | RW Limoges, Inc. | 3,371.00 |
| Total | | 581,229.86 |

In addition, Catallozzi gave a United States Treasury check dated February 27, 1989 directly to Par Lab Industries as payee in the amount of $13,688 for construction of the house.

Between January 6, 1988 and August 15, 1990, Kathleen Rehm wrote checks totaling $138,735.87 drawn on the CATS EMP, INC. account numbered 0002546513 at the Rhode

Island Hospital Trust National Bank. More than 90% of the funds drawn by her from the CATS EMP, INC. account during this period were used to pay for various non-business expenses unrelated to CATS EMP, INC.

B. *The Divorce*

On May 3, 1991, in *Robert R. Catallozzi vs. Kathleen M. Catallozzi*, F.C. No. 90–2352, R.I. Family Court, a final divorce decree was entered awarding Kathleen Rehm the property located at 5 Osprey Drive plus $150,000; the latter as consideration for the transfer of her interest in CATS EMP, INC. (which included an interest in a beach house in South Kingstown owned by CATS EMP, INC.) to Catallozzi. She received an additional $60,000 to compensate her for possible future commissions to be earned by CATS EMP, INC. She also gave up her interest in the home at 37 Glen Avenue, Cranston, Rhode Island where they had formerly lived. Catallozzi valued that property at $180,000 less a $15,000 mortgage. Catallozzi was also ordered to pay child support in the amount of $4,000 per month.

On April 16, 1992, Catallozzi stole a U.S. Treasury check in the amount of $261,000 and made it payable to his divorce attorney, Robert Flaherty. Flaherty deposited the check into his clients' account pursuant to the Catallozzi/Rehm divorce decree and he later issued a check from this account to Kathleen Rehm, in the amount of $190,000. On April 21, 1992, she deposited $185,000 of these funds into the defendant account, Advest Inc. Account No. 323–02342 (formerly 230–29416).

C. *Construction of the Westfield Drive Home*

On April 29, 1992, Kathleen Rehm withdrew $21,900 from the defendant account, Advest Inc. Account No. 323–02342 (formerly 230–29416), and used these funds to open the defendant investment account, Advest Inc. Account No. 323–02330 (formerly 230–29291).

On or about May 7, 1992, Kathleen Rehm borrowed $92,000 from Citizens Bank using the house located at 5 Osprey Drive, East Greenwich, as collateral. She then took $80,-000 of the loan proceeds and made a payment to Levesque Construction Inc. who was to build her a new home on the defendant real property located at 170 Westfield Drive, East Greenwich.

On July 1, 1992, Kathleen Rehm sold the house located at 5 Osprey Drive, East Greenwich, for approximately $625,000 (net proceeds $579,000). Out of the proceeds of the sale, she paid Citizens Bank the $92,000 owed as a result of the loan described above. After deduction of the sale expenses, Kathleen Rehm received approximately $477,000 as the net proceeds of that sale. On July 2, 1992, she deposited the $477,000 into Account No. 58–557285 in the name of Kathleen M. Catallozzi Rehm as trustee for David W. Rehm at Citizens Bank, Providence, Rhode Island.

On July 24, 1992, Kathleen Rehm withdrew $460,000 from the account at Citizens Bank and on July 27, 1992, she deposited the $460,000 into the defendant account, Advest Account No. 323–02330 (formerly 230–29291).

On October 9, 1992, Kathleen Rehm withdrew $40,000 from the defendant account, Advest Inc. Account No. 323–02330 (formerly 230–29291), and paid this amount to Levesque Construction for work done on the defendant real property.

On November 12, 1992, the defendant real property was formally transferred to the claimants, Kathleen M. Rehm and David W. Rehm. On or about the same date, Kathleen Rehm withdrew $182,000 from the defendant account, Account No. 323–02330 (formerly 23029291), and had the funds wired to the defendant account, Account No. 004–156352 in the name of Kathleen Rehm located at the Rhode Island Hospital Trust National Bank in Providence, Rhode Island. She then withdrew $167,268.81 from this account to pay the balance due at the closing. The remainder of the $677,268.81 purchase price of the defendant real property was financed with a $390,000 mortgage from Advest, Inc. which was secured by the transfer of $163,000 from the defendant account, Advest Inc. Account No. 323–02342 (formerly 230–29416) into the defendant account, Advest Inc. Trust Account 60–03–8220–39–2, and an additional transfer of $33,400 into the trust account

from the defendant account, Advest Inc. Account No. 323–02330 (formerly 230–29291).

The $167,268.81 plus the previous payments totaling $120,000 resulted in a total cash payment of $267,268.81 for the defendant real property.

If David Rehm provided any of the funds for the purchase and construction of the home on defendant real property, such funds were a relatively small portion of the purchase price.

### D. *Tax Returns and Other Checks*

Kathleen Rehm signed a 1988 joint federal income tax return prepared by Catallozzi which indicated a total adjusted gross income of $29,194. This sum included $44,045.13 from Catallozzi's wages as a postal employee, $6,700 self employment income from Kathleen's psychotherapy practice, and a $22,947.0 "other" loss.

Kathleeen Rehm's signature was forged on a 1989 joint federal income tax return which indicated a total adjusted gross income of $50,336. This sum included $44,022.18 from Catallozzi's wages as a postal employee, $7,142 self employment income from Kathleen's psychotherapy practice, and $8,548 income from subchapter S corporations.[1]

At or about the time Kathleen Rehm's divorce became final, she signed, on advice of her divorce counsel, a 1990 joint federal income tax return prepared by Catallozzi. This return indicated a total adjusted gross income of $47,636.17. This sum included $49,598 from Catallozzi's wages as a postal employee, $8,580 self employment income from Kathleen's psychotherapy practice, and a $13,073.77 loss from subchapter S corporations.

Catallozzi did not deposit all of the stolen Treasury checks into the CATS EMP, INC. account or other bank accounts in which he had an interest. Five checks totaling more than $737,000, including the aforementioned $145,000 check, were made payable to real estate attorney James Vespia and were used for various real estate purchases. One check

---

1. These figures add up to more than $50,336. This Court takes the amounts from the Agreed

in the amount of $15,946.12 was deposited by Catallozzi into the bank account of Valerie (Shelko) Bass, one check in the amount of $36,545 was paid to Nelson King & Co. for a Winnebago, one check in the amount of $20,491 was paid to R. Blinkhorn & Co. as a deposit on a restaurant that Catallozzi never purchased, one check in the amount of $225,000 was paid to Fleet National Bank or Robert Pesce and one check in the amount of $44,612.28 was paid to Custom Woodwork and Design.

### II. *Standard of Review*

A motion for summary judgment is listed as one of the motions on which a magistrate judge may not make a final determination. *See* 28 U.S.C. § 636(b)(1)(A). Therefore, this Court utilizes de novo review of the Magistrate Judge's Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(C).

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

On a motion for summary judgment, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103,

Statement of Facts filed January 17, 1996.

106 (1st Cir.1997). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995). Similarly, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991). The coincidence that both parties move simultaneously for summary judgment does not relax the standards under Rule 56. See *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996). Barring special circumstances, the Court must consider each motion separately, drawing inferences against each movant in turn. See *id.*

### III. *The Rehms' Standing*

The United States argues that it is entitled to summary judgment because the Rehms lack standing in this case since they cannot allege an ownership interest in the property.

■ Once the government has shown probable cause to believe that the defendant assets are subject to forfeiture, the burden shifts to the claimants of the assets to prove by a preponderance of the evidence: 1) that they had an ownership interest in the seized property; and 2) that they were ignorant of the illegal conduct which gave rise to the seizure. See 21 U.S.C. § 881(d) (applying standard from 19 U.S.C. § 1615). *See also United States v. Two Hundred Fifty Thousand Dollars ($250,000.00) in U.S. Currency*, 808 F.2d 895, 897–900 (1st Cir.1987) [*hereinafter U.S. v. $250,000*] (upholding burdens). The claimants must establish a prima facie basis for asserting a claim to the property. The standing requirement does not force the claimants to prove a claim superior to the government's. The parties do not dispute that the Rehms jointly hold title to the Westfield Drive property and that Kathleen Rehm holds title to the defendant accounts. That would normally suffice to provide the Rehms with standing to contest the forfeiture.

■ This case offers an unorthodox wrinkle because the property at issue allegedly has dual characteristics—it is traceable, at least in large part, to the product of Catallozzi's crimes, and the original funds were stolen from the United States. Therefore, the United States is both the sovereign demanding forfeiture and the alleged owner demanding repayment. The United States argues that the Rehms cannot claim ownership because they hold the government's property in a constructive trust. Because the property was stolen, the United States argues, the Rehms would be unjustly enriched to retain it, and they have a duty to return it to its rightful owner.

■ This Court holds that the United States cannot utilize the doctrine of constructive trust to defeat a claimant's standing in a civil forfeiture case. Rhode Island offers a procedure for a fraud victim to recover stolen property through a constructive trust. See *Roseman v. Sutter*, 735 F.Supp. 461, 466 (D.R.I.1990); *Simpson v. Dailey*, 496 A.2d 126, 128 (R.I.1985); *Desnoyers v. Metropolitan Life Ins. Co.*, 108 R.I. 100–113, 272 A.2d 683, 690 (R.I.1971). To give rise to a constructive trust, fraud or a similar injustice must be established by clear and convincing evidence. See *Desnoyers*, 108 R.I. at 112, 272 A.2d at 690. A constructive trust is "based on fraud or deceit practiced upon the grantor by the grantee." *Id.* (quoting *Lawrence v. Andrews*, 84 R.I. 133, 139, 122 A.2d 132, 135 (R.I.1956)). To date, the United States has proved neither fraud by the Rehms nor that the defendant property was purchased entirely with government money. Even clear and convincing evidence that *some* government money ended up in the defendant accounts or paid for the Westfield Drive property would be insufficient to deny the Rehms standing in this case.

For this Court to impose a constructive trust as a preliminary matter would be totally unjustified. A constructive trust is appropriate where the defendant or claimant has no right to the property. But that question—whether or not the Rehms have the right to the property, i.e., whether or not they were party to the fraud—is the very issue that the forfeiture action will answer.

The United States correctly cites this Court's precedent that:

> "[w]here a defendant has used the funds of a plaintiff to purchase new property, the plaintiff may have the option of enforcing either a constructive trust *of the property* or an equitable lien *against the property.*"

*Darr v. Muratore,* 143 B.R. 973, 976 (D.R.I. 1992) (emphasis in original). However, it ignores that these equitable remedies are "based upon the great maxim 'equity regards as done that which ought to have been done.'" *Id.* (quoting *Finkelstein v. Finkelstein,* 502 A.2d 350, 354 (R.I.1985)). Here, the forfeiture case will decide what ought to have been done.

The United States could have sued the Rehms' directly to recover the property. As Judge Boudewyns noted, it should have followed that course if it thought that it could prove its case for unjust enrichment. It cannot choose the powerful tool of civil forfeiture and then ask this Court to beg the question and impose a constructive trust before hearing the merits.

Therefore, the United States' motion for summary judgment is denied.

## IV.  *The Statute of Limitations*

The Rehms make two statute of limitations arguments in an attempt to secure summary judgment or limit the United States' recovery. First, they ask this Court to choose a one-year statute of limitations based on 18 U.S.C. § 984. The United States argues for the five-year limit from 19 U.S.C. § 1621. Second, claimants argue that no matter which length is chosen, it should be measured from the time when the Postal Service should have noticed Catallozzi's defalcations. They suggest that would be one year after the cashed checks were returned to the Postal Service from the banks on which they were drawn.

### A.  *The Length of the Statute of Limitations*

The length of the statute of limitations turns on whether the defendant property qualifies as "fungible" (one-year limit from 18 U.S.C. § 984) or as the "direct proceeds" of Catallozzi's money laundering (five-year limit

from 19 U.S.C. § 1621). In this case, Catallozzi stole Postal Service checks and appropriated the proceeds. Some of the proceeds of those checks were commingled with legitimate money in the CATS EMP, INC. bank account which he used for his so-called real estate business. Later, checks were issued from that account and used to build the home at 5 Osprey Drive, East Greenwich. That property went to Kathleen Rehm as a result of the divorce and then was sold by her with the proceeds going into defendant bank accounts and the purchase of the Westfield Drive property. David Rehm's name was put on that property by Kathleen. The Rehms argue that the commingling in the CATS EMP, INC. account makes it impossible for the United States to trace the "direct proceeds" of the crime and makes all the money "fungible."

### 1.  *"Voigt" and traceable money*

The Third Circuit lends support to the Rehms' reasoning in *United States v. Voigt,* 89 F.3d 1050, 1087–88 (3d Cir.1996). Defining the words "traceable to" in the criminal forfeiture laws, the *Voigt* Court held that the United States must prove that the property it seeks to forfeit has a nexus to property involved in the crime. *See id.* The *Voigt* Court noted that would be easier where the criminal kept $500,000 in cash at home rather than putting it in a bank:

> Where the property involved in a money laundering transaction is commingled in an account with untainted property, however, the government's burden of showing that money in the account or an item purchased with cash withdrawn therefrom is 'traceable to' money laundering activity will be difficult, if not impossible, to satisfy. While we can envision a situation where $500,000 is added to an account containing only $500, such that one might argue that the probability of seizing 'tainted' funds is far greater than the government's preponderance burden (50.1%), such an approach is ultimately unworkable.

*Id.* at 1087. Where the United States could not trace the money, it would have to seek forfeiture under the "substitute asset" provision of 18 U.S.C § 982(b)(1) (incorporating 21

U.S.C. § 853(p)(5)). *See id.* at 1088. Thus, in that case, the government could not trace crime money to jewelry bought with money from a commingled account. *See id.*

The Rehms ask the Court to transfer this logic from criminal forfeiture to civil forfeiture. They suggest that "direct proceeds" be read as "traceable to" and "fungible" as "substitute assets." The Third Circuit implies a criminal-civil similarity where it compared its analysis to the Second Circuit's discussion of a civil forfeiture case, *United States v. Banco Cafetero Panama,* 797 F.2d 1154 (2d Cir.1986). *See Voigt,* 89 F.3d at 1087 n. 22.

The United States underestimates the power of the *Voigt* reasoning when it completely ignores the issue in its Reply. The United States has evidence that Kathleen Rehm received illicit money, but to prove "direct proceeds," it must prove the defendant property is the same illicit property. The problem here is that the money has no physical existence. Catallozzi stole checks, and once the dollars were deposited in the CATS EMP, INC. account, they became an abstract debt by the bank to pay the corporation. Therefore, it is impossible for the government to come to court with actual dollar bills stolen by Catallozzi and located now in the Rehms' bank accounts. The First Circuit cases cited by the United States discuss how to determine probable cause to forfeit, but they do not settle how to determine whether the defendant property is fungible or direct proceeds.

2. *"Mixed" money and "mixed and moved" money*

As noted above, the United States faces a special difficulty when it tries to forfeit money in a bank account as the "direct proceeds" of crime because that money, unlike automobiles or barrels of cash, cannot be physically identified. Although courts have not previously noted the distinction, the United States actually faces two distinct difficulties—one when the illicit money is mixed with legitimate money and a second when that "mixed" money is moved.

■ When illicit money is mixed in an account with legitimate money, the United States may forfeit as direct proceeds only the illicit money. To trace the illicit money, the Second Circuit tapped a trusts doctrine and applied an accounting technique known as the "lowest intermediate balance" analysis exemplified by this illustration: if $100 from a drug sale is deposited into an active account, the proceeds in the account are "traceable" to the extent of $100 as long as the account balance never falls below that amount; untainted money added to the account after the balance falls below $100 is immune from seizure. *See Banco Cafetero,* 797 F.2d at 1159; *United States v. All Funds Presently On Deposit or Attempted to be Deposited In Any Accounts Maintained,* 832 F.Supp. 542, 552 (E.D.N.Y.1993). The Second Circuit referred to this analysis as the "drugs in—last out" rule. *See Banco Cafetero,* 797 F.2d at 1159; *All Funds,* 832 F.Supp. at 552.

■ As to mixed money in a bank account, this Court broadens the "drugs in—last out" rule into an "illicit in—last out" rule. The government may forfeit the lesser of the illicit money or the lowest balance since the illicit money was deposited. This holding is suggested by First Circuit precedent that the government has a partial interest in a house purchased with a mix of illicit and legitimate money. *See United States v. One Parcel of Real Property,* 921 F.2d 370, 373–75 (1st Cir.1990). The *One Parcel* Court was explicit that the government could forfeit a percentage of the property acquired as a result of tainted money. *See id.* at 377. The government could not forfeit the entire property merely because drug money paid part of the mortgage, and the claimants could not protect the entire property merely because some untainted money was used. *See id.* at 373–77. *See also United States v. Pole No. 3172, Hopkinton,* 852 F.2d 636, 640 (1st Cir. 1988) ("the government may have an interest equal only to the portion of the property acquired" through the proceeds of drug transactions).

When that "mixed" money is moved, the problem is different. If a person were to pull a handful of money from a bag filled with 100 stolen $1 bills and 100 legitimate $1

bills, this Court would be unable to tell how much of that handful—and therefore how much of the remainder in the bag—was illicit or legitimate. Faced with this analogy when a person removes money from a "mixed" bank account, courts have split on whether the government can trace the illicit money through to wherever the money is moved or whatever the money purchases. The *Voigt* Court held that jewelry purchased with money from a mixed account could not be traced. *See Voigt*, 89 F.3d at 1087–88. The *Banco Cafetero* Court held that the government could trace illicit money into any withdrawal or purchase to the extent of the illicit deposits. This is a "drugs in—first out" theory that taints withdrawals and assumes the criminal left the legitimate money in the account *See Banco Cafetero*, 797 F.2d at 1159–60.

The decisions take diametrically opposed stances on tracing the money. Despite some equivocating dicta, the Third Circuit gives criminals the benefit of the doubt. It holds that the government must actually trace the untraceable. Because the government cannot prove that withdrawn money is actually illicit money, it cannot forfeit "mixed and moved" money as traceable. *See Voigt*, 89 F.3d at 1087–88. In contrast, the Second Circuit turns the concept of tracing into a legal fiction. It holds that the United States can choose on a case-by-case basis between "drugs in—last out" or "drugs out—first out." *See Banco Cafetero*, 797 F.2d at 1159–60. With that power, the government's forfeiture is only limited by the amount of the illicit deposits because it chooses what is "traceable" by deciding whether to trace to the mixed account or to withdrawals. Obviously, the government will choose its theory based on the property that remains to be forfeited.

██ As to "mixed and moved" money, this Court adopts the *Banco Cafetero* stance. Forfeiture under 18 U.S.C § 984 of "direct proceeds" of crime does not require the United States to trace the individual dollar bills through bank accounts.

██ In rejecting *Voigt*, this Court notes that the Third Circuit was dealing with a criminal case, in which the government could forfeit the defendant property as a "substitute asset." *See Voigt*, 89 F.3d at 1088. In accepting *Banco Cafetero*, this Court notes that Congress assigned to the claimant the risk of uncertainty about whether legitimate money is included in the "mixed and moved" money. *See Banco Cafetero*, 797 F.2d at 1160. The government has a lenient burden of proof in obtaining forfeiture of proceeds of illegal transactions; it need only demonstrate a probable cause for a forfeiture. The claimants must then prove that the property should not be forfeited, either because it cannot be traced as direct proceeds or because they are innocent owners for another reason. This does differ from the elaborate set of tracing rules in trust doctrine, but it is important to note that the law of trusts was designed to adjust accounts between honest persons. The precise protections inherent in those rules are not suited to frauds in which funds have been shuffled at least in part for the purpose of disguising their source. *See United States v. $448,-342.85*, 969 F.2d 474, 477 (7th Cir.1992).

██ Finally, it is clear that where illicit money is used to purchase equity in property and that property is sold, the property acts identically as a bank account. Where a house was purchased with a mix of illicit and legitimate money, the government has an interest in the house up to value of the illicit money. *See One Parcel*, 921 F.2d at 373–75. Therefore, it has a similar interest in the proceeds of the property's sale.

### 3. The meaning and purpose of "fungible"

The Rehms argue that this kind of interpretation makes 18 U.S.C. § 984 superfluous because almost any property would qualify as direct proceeds. However, that is not true. Section 984 and its one-year statute of limitations were passed in 1992 to deal with cases in which defendants "zeroed out" bank accounts and defeated the "drugs in—last out" accounting. *See All Funds*, 832 F.Supp. at 557–59. Money would be deposited into a bank account. That account would be emptied in the course of a legitimate business, and then other money would be deposited into the account. The problem for law en-

forcement was that the new money was "not guilty" in that it was not the actual money used in the crime. *See id.* at 556 (comparing problem to the government trying to forfeit a building merely because its owner used to own another property that was used for drug dealing but was demolished before forfeiture could begin). In that way, the money in the target account was fungible. It was replacement money, targeted only because it exists in a bank account where criminal money once rested. In those cases, the government must commence forfeiture within a year of the date of offense. *See* 18 U.S.C. § 984(b)(1)(C).

■ Nothing in 18 U.S.C. § 984(b)(1)(C) makes cash automatically "fungible" merely because it is mixed in an account with legitimate money. In *All Funds,* the defendant bank accounts were owned by Ecuadoran money exchange companies in which the balance gyrated from millions of dollars to $24,000. *See All Funds,* 832 F.Supp. at 549. The *All Funds* cash was fungible because the criminal deposits were removed almost entirely and then replaced. Under the "drugs in—last out" theory, the government could link no more than $24,000 of the current deposits to illicit activity. The "fungible" concept allows the government to forfeit the money anyway, and Congress limited that power to one year after discovery of the crime.

If the Rehms can offer facts that show the mixed accounts were zeroed out at some point, then § 984 would apply to this case. However, the current record does not support that view.

■ To summarize, whether the defendant properties are "direct proceeds" of the criminal activity is an issue of law. The government must show probable cause that the properties were direct proceeds; that criminal money was deposited in the accounts or was used toward the purchase of the real property. At that point, the claimants bear the burden of proving the opposite. Where illicit money was mixed with legitimate money and then moved or used to purchase property, the mingling does not defeat direct proceeds. The United States can choose between "drugs in—first out" or "drugs in—

last out" according to the circumstances up to the amount of illicit money that it can trace into a mixed account.

The trial court should look to the aggregate of the facts. *See United States v. Parcels of Land,* 903 F.2d 36, 42 (1st Cir.1990); *U.S. v. $250,000,* 808 F.2d at 899. The United States may use circumstantial evidence or evidence that would be inadmissible at trial, so long as the evidence is reliable. *See Parcels of Land,* 903 F.2d at 38; *U.S. v. $250,000,* 808 F.2d at 899. The United States need not link the defendant property to a particular transaction. It is sufficient to demonstrate that the proceeds are traceable to money laundering activity generally. *See Parcels of Land,* 903 F.2d at 42.

### 4. *Applying the facts of this case*

˙ The United States seeks to forfeit four properties in this case: the Westfield Drive property, Advest Account No. 323–02342 ("Account # 02342"); Advest Account No. 323–02330 ("Account # 02330"); and Advest Trust Account No. 60–30–8220–39–2 (the "Trust Account"). This Court notes the amounts and timing of the various transactions listed in the agreed facts. It also notes that Catallozzi stole more than $1.6 million and that he and Kathleen Rehm filed joint federal income tax forms that listed $29,194, $50,336 and $47,636.17 in adjusted gross income for 1988, 1989 and 1990 respectively. Based on the aggregate of these facts, the United States has shown probable cause that each property is direct proceeds of Catallozzi's money laundering.

If the CAT EMPS, INC. bank account ever zeroed out or reached a low balance, the Rehms may be able to prove that the checks used to pay for the Osprey Drive property were legitimate money or fungible proceeds. Any fungible proceeds would be governed by the one-year statute of limitations, and they would likely be excluded from the forfeiture. That would lower the amount of money the United States could recover, but it would not end this case because there are at least three other sources of illicit funds that never passed through the CATS EMP., INC. account.

These three other sources of illicit money are:

1) the stolen $145,000 Treasury check dated August 11, 1988. That money apparently went into real estate attorney James Vespia's trust account and was used to purchase the Osprey Drive property.

2) The stolen $13,688 Treasury check that Catallozzi gave directly to Par Lab Industries for construction of the Osprey Drive house.

3) The stolen $261,000 Treasury check that Catallozzi gave to attorney Robert Flaherty. That money apparently went into Flaherty's trust account and paid for a $190,000 check to Kathleen Rehm, of which $185,000 was deposited in Account # 02342.

At one point, therefore, the Osprey Drive property included direct proceeds—what could be called an "illicit equity"—of more than $739,000, and Account # 02342 had an illicit equity of $185,000.

By charting the subsequent transactions using the "drugs in—first out" rule, it is possible to show probable cause that all four defendant properties contain the direct proceeds from crime. The exact amounts cannot be determined from the current evidence because it is unclear whether legitimate money was deposited in any accounts and whether withdrawals were made that are not included in the agreed facts. However, the Osprey Drive property was sold for less than its illicit equity, and no bank account mentioned in the agreed facts, including non-defendant accounts, has listed withdrawals that exceed their illicit equity.

If there were no legitimate deposits or significant withdrawals, then the bulk of the direct proceeds appears to rest in the Westfield Property (the entire $267,268.81 cash payment); the Trust Account (the entire $196,400 balance); and Account # 02330 (approximately $304,000). These are estimates and assumptions based on the agreed facts, not findings of this Court. The parties would have to introduce evidence of the exact amounts at trial. To set the correct amount for forfeiture, the United States must track which transactions included illicit money, and it would be limited by the illicit sources listed

above. The Rehms bear the burden of proving that the money is not direct proceeds.

B. *The Starting Point of the Limitations*

The pleadings appear to conflict on the date that Catallozzi's fraud was discovered. The United States' Reply says it was discovered and he was fired in April 1992. (Reply at 6.) The agreed facts indicated that the fraud continued to April 1994. The date is immaterial using the five-year statute of limitations, but would be significant if the Rehms can prove that any of the funds were fungible.

The burden is on the claimants to establish by a preponderance of the evidence the time at which the government discovered the alleged violations underlying the forfeiture action. *See United States v. Premises Known as 318 South Third Street, Minneapolis*, 988 F.2d 822, 825–27 (8th Cir.1993). *See also United States v. Real Property, Titled in the Names of Godfrey Soon Bong Kang and Darrell Lee*, 120 F.3d 947, 949 (9th Cir.1997).

The United States has introduced testimony from Postal Inspector Michael Bullock that the embezzlement continued until 1992. Despite the United States' contention, that testimony does not indicate when the Postal Service discovered the fraud. However, the Rehms offer no evidence at all. They ask this Court to imply knowledge because the United States received the stolen checks after they had been cashed by the payees. They suggest that the limitations period began a year after the Postal Service received the cancelled checks. This Court will not import this Uniform Commercial Code provision concerning bank customers into a case based on fraud by the Postal Service's own accountant.

The five-year limitations period began when the United States discovered the fraud. The Rehms, to date, have not offered any evidence as to when that occurred.

Therefore, the motion of the claimants for summary judgment is denied.

## IV. The Effect of the Criminal Prosecution

The Rehms argue that the United States is limited to a recovery of the $630,476.76 alleged in the Criminal Information against Catallozzi. The dearth of cases cited on this issue in Claimants' Memorandum is eloquent evidence that the law does not support the contention.

A civil *in rem* forfeiture action is completely independent of any related criminal prosecution. A civil *in rem* action could be brought simultaneously with the criminal in personam case, *see United States v. One 1986 Chevrolet Van*, 927 F.2d 39, 41 (1st Cir.1991), or even before the criminal case, *see In re Kingsley*, 802 F.2d 571, 572 (1st Cir.1986). A civil forfeiture may even be brought where an owner is acquitted of the related criminal charges. *See United States v. One Urban Lot*, 14 F.3d 45 (Table), 1994 WL 9790, *3 (1st Cir.1994).

Therefore, the amount of money identified in Catallozzi's criminal case places no limitation on the United States in this case. The United States bears the burden of proving probable cause that the defendant properties are direct proceeds of crime. The burden does not change if the amount to be seized exceeds the amount in the Criminal Information.

## V. Conclusion

For the preceding reasons, the cross motions for summary judgment are denied. The five-year statute of limitations will be applied, and it will be measured from the time the United States discovered Catallozzi's crimes. The amount of property to be seized will not be limited by the Criminal Information filed against Catallozzi.

It is so Ordered.