176 F.3d 941
 UNITED STATES of America, Plaintiff-Appellee,
v.
UNITED STATES CURRENCY DEPOSITED IN ACCOUNT NO.
1115000763247 FOR ACTIVE TRADE COMPANY, LOCATED AT
FIRST NATIONAL BANK, CHICAGO, ILLINOIS, Defendant,
Active Trade Company, Claimant-Appellant.
 No. 98-2564.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 21, 1999.
Decided May 3, 1999.
 
 Thomas P. Walsh, Anthony J. Masciopinto (argued), Office of the United States Attorney, Civil Division, Chicago, IL, for Plaintiff-Appellee.
 Christopher W. Helt (argued), Chicago, IL, for Claimant-Appellant.
 Before BAUER, COFFEY, and MANION, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 On March 14, 1997, the United States filed a civil forfeiture complaint, pursuant to 18 U.S.C. § 981, to seize all funds deposited in a bank account held in the name of Active Trade Company at the First National Bank of Chicago ("First Chicago"). On May 22, 1998, the district court entered a decree of forfeiture against Active Trade's account at First Chicago number 1115000763247 (the "Account"). Active Trade, as claimant of the Account, now appeals that ruling on two grounds. First, it argues that the government did not have probable cause to seize the Account because its second amended verified complaint was partly based on false testimony. Second, it argues that even if the government did have probable cause, it was not entitled to all of the funds in the Account because it did not show, nor did the district court specifically find, that all of the funds in the Account were involved in or traceable to the alleged fraudulent transactions. We affirm the district court's forfeiture decree.
 
 I. BACKGROUND
 
 2
 In March of 1997, First Chicago received a customer complaint of fraudulent activity with respect to the Account. First Chicago placed a freeze on the Account, and Special Agent G. Michael Verden with the United States Secret Service ("Agent Verden") began investigating the complaint, looking for mail fraud or a money laundering scheme. Agent Verden became aware of suspicious activity when an agent with The Carter Center, a charitable organization founded by former President Jimmy Carter, received a letter soliciting funds for the Nigeria Guinea Worm Eradication Program ("NIGEP"). The letter asked for financial assistance in eradicating the Guinea Worm Disease in Nigeria, it fraudulently listed legitimate organizations that purportedly supported the program, and it named a bank account where "humanitarians/sympathizers" could send money. The bank account listed was the Account in question in this case. Upon further investigation, the letter was determined to be fraudulent and not from NIGEP, an otherwise legitimate organization. Furthermore, in the approximately nine months that the Account was open, 142 deposits totaling approximately $1,924,892.67 and 124 withdrawals totaling approximately $1,958,982.38 were made. Based upon the information supplied by Agent Verden, on March 14, 1997, the United States filed a verified complaint to seize the contents of the Account. Active Trade filed a motion to dismiss the complaint.
 
 
 3
 The government ultimately filed a second amended verified complaint (the "S.A.C.") that described the NIGEP scheme to defraud, along with several other fraudulent schemes, most of which involved the Account. The information came from the affidavit of Agent Verden, as well as the deposition testimony of the victims of the fraudulent schemes, and the bank records of the Account. The first scheme, known as a "fee advance" scheme, was called the Central Bank of Nigeria Scheme to Defraud. A fee advance scheme, as the name suggests, is a fraudulent scheme wherein individuals are solicited to pay money up front for such things as taxes and services in return for a promise that they will receive a much larger sum of money in the future. The government claimed that an individual from Nigeria contacted Dr. Charles Crumb ("Crumb") and instructed him, among other things, to pay $26,525.00 to the Account so that he could receive the sum of $30,500,000.00. After Crumb transferred the money into the Account, he was instructed to transfer another $87,786.00 into the Account, which he did. Needless to say, Crumb never received any portion of the $30,500,000.00. Things too good to be true are nearly always untrue. Greed frequently overcomes common sense.
 
 
 4
 The S.A.C. described two other fee advance schemes similar to the Central Bank of Nigeria Scheme. The first was entitled the Emeka D. Scheme to Defraud. Here, an individual known only as Emeka D. instructed Marrian Myrberg ("Myrberg"), among other things, to transfer $7,000.00 to a bank account in Switzerland so that she could then receive a $30,000,000.00 disbursement. Several months later, Emeka D. contacted Myrberg again and instructed her to transfer an additional $5,000.00 fee to the Account. Rather than sending the additional "fee" as she had before, Myrberg contacted officials at First Chicago with regard to this matter.
 
 
 5
 The next fee advance scheme described by the government was called the Nigerian National Petroleum Corporation Scheme to Defraud. In this scheme, Perry Turner ("Turner") was told that if his company acted as the beneficiary of an "overinflated" budget, it would receive 30% of $32,000,000.00. Turner wired $13,850.00 to the Account, along with an additional sum of $35,030.00 to an account in England, being told that the money was for fees and other taxes arising from the transaction. Again, neither Turner nor his company ever saw a penny of the $32,000,000.00. The late Barnum may have underestimated the birth rate of the gullible.
 
 
 6
 Lastly, the government described what was called the Juice Concentrate Scheme. Here, Mr. Glenn Elion ("Elion") claimed that he negotiated to purchase juice concentrate for his vineyard in Massachusetts. Over the course of several months, Elion transferred a total of $217,000.00 into the Account. Elion claimed to have never received the juice concentrate. Upon further discovery, however, Elion changed his testimony. He claimed that the Juice Concentrate Scheme never occurred, but rather that he was instructed to fabricate the scheme in the event that he was ever asked any questions regarding his wire transfer to the Account. He never denied being fraudulently induced to transfer money to the Account, but he later said that it was for a fee advance scheme where he was promised 20% of $25,000,000.00. This information was not contained in the amended complaint, but it was brought to the district court's attention on April 22, 1998 during a proceeding in front of the court. Elion never received his share of the pot, either. Another sheep who sought to run with the wolves.
 
 
 7
 Based on all of this information, the district court found that the government had established probable cause to seize all of the money in the Account.
 
 II. DISCUSSION
 
 8
 The standard of review for whether probable cause has been established is a bit unsettled. In this circuit, we have held that questions of law should be reviewed de novo, while questions of fact are reviewed for clear error. United States v. Sholola, 124 F.3d 803, 811 (7th Cir.1997). Though not in the context of a civil forfeiture case, the Supreme Court recently held in Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), that "as a general matter, determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Id. In Ornelas, the Supreme Court also pointed out that a reviewing court should review historical facts for clear error, and it should give "due weight to inferences drawn from those facts[.]" Id. Whether we apply a clear error standard or a de novo review, however, our result in this case would be the same.
 
 A. Probable Cause
 
 9
 Active Trade first argues that the court erred in finding that the government had established probable cause to seize the Account because the S.A.C. contained, in part, false information with respect to the alleged fraud. Under 18 U.S.C. § 981(a)(1)(A), "[a]ny property ... involved in a transaction or attempted transaction in violation of ... section 1956 ... of this title, or any property traceable to such property" is subject to forfeiture by the United States. 18 U.S.C. § 981(a)(1)(A). Section 1956 deals with crimes involving the laundering of money. 18 U.S.C. § 1956. In addition, § 981 subjects property obtained through mail or wire fraud to forfeiture as well. 18 U.S.C. § 981(a)(1)(D).
 
 
 10
 For the government to seize any property pursuant to § 981, it must first establish probable cause that the property was involved in an illegal transaction. United States v. All Assets and Equipment of West Side Bldg. Corp., 58 F.3d 1181, 1188 (7th Cir.1995). In order for the government to establish probable cause in a civil forfeiture case, it must demonstrate a "reasonable ground for the belief of guilt supported by less than prima facie proof but more than mere suspicion." United States v. $94,000.00 in United States Currency, along with any Interest earned thereon in First Financial Sav. Ass'n Account No. 79-70063411, 2 F.3d 778, 782 (7th Cir.1993) (quoting United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars ($364,960) in United States Currency, 661 F.2d 319, 322-23 (5th Cir.1981)). The government need not make an actual showing of illegality, but must only show a probability or substantial chance of criminal conduct. United States v. Certain Real Property, Commonly known as 6250 Ledge Road, Egg Harbor, WI, 943 F.2d 721, 725 (7th Cir.1991). The procedure for determining probable cause in civil forfeiture actions is similar to that for determining probable cause in a criminal setting; the court should look at the totality of the circumstances in making its decision. United States v. Michelle's Lounge, 1992 WL 194652 at * 3 (N.D.Ill.1992) (citing Illinois v. Gates, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Hearsay and other inadmissible evidence may be used in establishing probable cause, so long as the evidence bears strong indicia of reliability. Cf. Michelle's Lounge, 1992 WL 194652 at * 3. However, if unreliable information, such as a false statement in an affidavit, is used to establish probable cause and there is not enough other reliable evidence to support a finding of probable cause, then the initial finding of probable cause will be void. Cf. Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (search warrant must be set aside if, without the use of false statements, there is not enough evidence to establish probable cause); United States v. One 1987 Mercedes Benz, 190E VIN: WDBDA28DXHF373152, 1992 WL 198441 (N.D.Ill.1992) (seizure warrant was invalid because the false statement was so crucial in obtaining the warrant that it would not have been issued without it).
 
 
 11
 After the government makes an initial showing of probable cause, the burden shifts to the claimant to show, by a preponderance of the evidence, that the property is not subject to forfeiture, i.e. that it was not involved in an illegal transaction. West Side Bldg., 58 F.3d at 1189. Without a sufficient rebuttal, the government's initial showing of probable cause will suffice to support the forfeiture. Id.
 
 
 12
 Here, Active Trade claims that the district court erred when it found that the government had probable cause to seize the funds in the Account because the S.A.C. contained false statements from Elion with respect to the Juice Concentrate Scheme. It claims, and the government does not deny, that Elion's first deposition testimony was false, and that Elion later admitted that the Juice Concentrate Scheme never existed. Active Trade contends that the district court could not predicate its finding of probable cause on the basis of the S.A.C. because of these false statements. At the very least, Active Trade suggests that the S.A.C. be amended so it can have an ample opportunity to defend its property against these charges.
 
 
 13
 The government concedes that some of Elion's statements that it relied upon in the S.A.C. were untrue. However, the government insists that the only falsity in Elion's statements related to the type of fraud involved and not to the existence of fraud. In Elion's first deposition, he said that he was induced to wire a total of $217,000, in separate installments, to the Account around September of 1996 and February of 1997 in order to obtain fruit juice concentrates for his vineyard. In his second deposition, however, he admitted that this, in fact, was not true, and that the money was sent so that he could receive a portion of the proceeds from the Nigerian National Petroleum Company. He also claimed that he lied in his first deposition because he was told to do so. Furthermore, he said that he was told that if he did not fabricate the Juice Concentrate Scheme, he would never see his money and his safety and his family's safety would be at risk.
 
 
 14
 The government provided substantial other evidence of fraud on the part of Active Trade that is independent of Elion's first deposition, all of which detailed one fee advance scam or another. Crumb and Turner both testified to the fraudulent activities in their depositions. The government also submitted an affidavit from Agent Verden who investigated these fraudulent schemes, as well as the bank records from First Chicago showing numerous deposits and withdrawals from the Account within a short period of time. Lastly, Elion's revised testimony tends to support the other allegations of fraud as it involves the same fee advance scheme as the one described by Turner. The government, based on the record, submitted sufficient evidence to show more than a mere suspicion that the Account was involved in illegal activity. The district court did not err in finding that the government had established probable cause to seize the Account.
 
 
 15
 B. Seizure of the Entire First Chicago Bank Account
 
 
 16
 Active Trade's second argument is that the district court erred by not making a specific finding as to exactly how much of the money in the Account was subject to forfeiture. 18 U.S.C. § 984 has relieved the government of having to identify the exact property in a financial institution that was involved in money laundering schemes. 18 U.S.C. § 984(b)(1)(A). In addition, it eliminates the defense that the actual property involved in the illegal activity has been removed from a financial institution and replaced with identical property. 18 U.S.C. § 984(b)(1)(B). So long as the property involved in the forfeiture is money or other fungible property, the government need only establish probable cause for the amount of money, and not the specific bills traceable to the illegal activity. Cf. United States v. $814,254.76 in U.S. Currency, Contents of Valley Nat. Bank Account No. 1500-8339, 51 F.3d 207 (9th Cir.1995).
 
 
 17
 Sections 981 and 984 are relatively recent additions to Title 18, and courts have not uniformly applied their provisions. A similar statute enabling the government to seize property involved in illegal activity which courts have used for guidance is 21 U.S.C. § 881. That section subjects any property used in, or used to facilitate an illegal drug sale, to seizure. Id. The language of that section specifically includes property used to "facilitate" an illegal drug transaction. 21 U.S.C. § 881(a)(6). Unlike 21 U.S.C. § 881(a)(6), however, neither 18 U.S.C. § 981 nor 18 U.S.C. § 984 specifically subjects property used to "facilitate" an illegal transaction to forfeiture. Thus, there is some disagreement among the courts about whether legitimate money derived from legal sources that is in a bank account used to facilitate a money laundering scheme is subject to forfeiture along with the actual proceeds from the laundering scheme. Some courts hold that legitimate funds kept in a bank account that is used for money laundering facilitate the fraud and are therefore subject to forfeiture because, without the use of these legitimate funds, a money laundering scheme could not be successful. See e.g. United States v. Certain Accounts, Together with all Monies on Deposit Therein, 795 F.Supp. 391 (S.D.Fla.1992); United States v. Certain Funds on Deposit in Account No. 01-0-71417, Located at the Bank of New York, 769 F.Supp. 80 (E.D.N.Y.1991); United States v. All Monies ($477,048.62) in Account No. 90-3617-3, Israel Discount Bank, New York, N.Y., 754 F.Supp. 1467 (D.Haw.1991). Others hold that since Congress did not specifically include the word "facilitate" in either § 981 or sec. 984, as it did in 21 U.S.C. § 881, only funds used in or traceable to the illegal activity are subject to forfeiture, and not any commingled legitimate funds used in facilitating the scheme. See e.g. United States v. All Funds Presently on Deposit or Attempted to be Deposited in Any Accounts Maintained at American Exp. Bank, 832 F.Supp. 542 (E.D.N.Y.1993). Active Trade discusses this point in arguing that the government is not entitled to all of the funds in the Account. This particular issue is not essential in ruling on the case, so we decline to decide it today. The government does not suggest that it may seize all of the funds in the Account because they facilitated the money laundering scheme, but rather that all of the money in the Account is subject to forfeiture because the entire amount was involved in, or traceable to, Active Trade's fraudulent schemes. The government contends that the amount of the proceeds derived from the fraudulent activities exceeded the amount that was in the Account at the time it was seized.
 
 
 18
 In support of its position that the government is not entitled to the entire balance of the Account, Active Trade relies on United States v. Voigt, 89 F.3d 1050 (3d Cir.1996). Voigt does not apply here. While Voigt involved an individual convicted of a fee advance scheme, it was a criminal forfeiture case where the government seized two items of jewelry it claimed were traceable to the money received from the fraudulent activity, in order to satisfy the amount defrauded by the use of the criminal scheme. In that case, the Third Circuit found that, since legitimate funds were commingled in an account also being used for mail fraud, it was impossible for the government to prove that the jewelry was purchased with the proceeds derived from the criminal scheme. Id. at 1088. Therefore, the court reasoned, the government could not seize the jewelry simply because it was purchased with funds that came from a bank account that was used for illegal activity. Id.
 
 
 19
 Here, we are not concerned with other personal property that was seized, but only with the amount of money that was seized. Before the enactment of § 984, we held that a bank account's mere use in a money laundering scheme did not automatically entitle the government to seize all of the funds in that account. United States v. $448,342.85, 969 F.2d 474, 476 (7th Cir.1992). This court held in $448,342.85 that, unlike a drop of ink falling into a glass of water, one illegal dollar deposited into a bank account does not necessarily taint the rest of an otherwise legitimate bank account. Id. However, we also noted that if the proceeds from the fraudulent scheme exceed the amount of money contained in the defendant bank account, and the claimant cannot identify monies in the account that were obtained from lawful sources, then the government is entitled to the entire balance of the account. Id. at 477. We find that the latter case more closely resembles the situation at hand.
 
 
 20
 At the time the government seized the Account, it contained $212,888.79. An additional $78,249.00 was deposited, leaving a grand total of $291,137.79 seized by the government. The district court found that the government established probable cause to seize the entire balance of the Account. The district court based its decision on the government's S.A.C., the depositions from the victims of the fraudulent schemes, the affidavit submitted by Agent Verden, and the bank records of the Account. In the S.A.C., the government alleges that Crumb deposited a total of $114,311.00, Elion deposited a total of $217,000.00, and Turner deposited $13,850.00 into the Account, totaling $345,161.00 deposited into the Account because of fraudulent schemes. In addition, Myrberg deposited $7,000.00 into an account in Switzerland and Turner deposited an additional $35,030.00 into an account in England. The amount of money the victims were induced into depositing into the Account was far greater than the amount ultimately seized by the government.
 
 
 21
 While the district court did not specifically make this finding, it is apparent from the evidence in the record that the court based its determination on these facts. Regardless of whether the district court could have been more specific in its findings, there is no other logical way to interpret the court's holding. Since the district court determined that the government established probable cause that the Account was involved in illegal activity, and the evidence submitted by the government shows that the proceeds from the illegal activity exceeded the amount in the Account when seized, the district court's decision that the government could seize all of the funds was not in error. Nowhere in its brief does Active Trade argue that any funds in the account were derived from legitimate means and not subject to forfeiture. Its only argument is that the district court did not make a specific finding as to the amount subject to forfeiture. Therefore, absent any showing that funds were derived from legitimate sources, the entire balance of the Account was subject to forfeiture.
 
 III. CONCLUSION
 
 22
 For the aforementioned reasons, we AFFIRM the district court's decision that the government established sufficient probable cause to seize all of the funds in Active Trade's bank account number 1115000763247 at the First National Bank of Chicago.