# United States Court of Appeals
## For the First Circuit

No. 00-1059

UNITED STATES OF AMERICA,

Appellee,

v.

LYNDON BAINE BENJAMIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge.]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Lipez, Circuit Judge.

Colleen E. Carafotes, with whom S. Vanessa M.G. Von Struensee was on brief for appellant.
Jennifer Hay Zacks, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

**LIPEZ, Circuit Judge**.  Lyndon Benjamin appeals his convictions for one count of bank fraud, in violation of 18 U.S.C. § 1344, and two counts of engaging in transactions over $10,000 with property derived from a specified unlawful activity, in violation of 18 U.S.C. § 1957(a) and 18 U.S.C. § 2. Benjamin asserts six arguments on appeal.  We reject each of his arguments and affirm his convictions.

## I. Background

We briefly describe the facts of this case, in the light most favorable to the verdict, discussing the details more fully in our consideration of Benjamin's challenge to the sufficiency of the evidence.

In February 1998, Benjamin obtained a Massachusetts photo identification card using the false name "Ralph Chapel" and an unauthorized social security number.  He also filed a business certificate with the City of Boston for a business called Eastside Motorsports.  On March 31, 1998, Benjamin used the false identification card to open a bank account at Fleet Bank in the name of "Ralph Chapel d/b/a Eastside Motorsports" (Eastside Motorsports account).  He made a deposit of $100 to open the account.

On April 9, 1998, a man identified as Ian DeCosta deposited two checks totaling approximately $202,000 into the account recently opened by Benjamin. Frank Maggelet, a fraud investigator employed by Fleet Financial Group, testified that these deposits were made with deposit slips issued by the bank and pre-printed with the account information for the Eastside Motorsports account that Benjamin had just opened.[1] These checks were made payable to Stratus Computer, Incorporated. Testimony at trial indicated that these checks were intended to go to a post office box for processing, and that Stratus did not authorize the deposit of the checks into the Eastside Motorsports account.

Benjamin made large withdrawals from the account the same day that DeCosta made the deposit of over $200,000. Specifically, he wrote two checks, for $25,000 each, to Prime Speed, an auto parts business. Benjamin wrote a third check for $30,000 to Unique Creations hair salon. Additional draws on the account totaling $18,700 were made with checks written to cash and signed by Ralph Chapel on April 13, 14, 28, and 30, 1998.

---

[1] Although Maggelet originally misidentified the individual who deposited these checks as Benjamin, not DeCosta, he testified at trial that he made this misidentification on the basis of photographs of the defendant he considered to be of poor quality. This misidentification does not affect our analysis.

Surveillance photographs indicated that Benjamin was the person cashing all of these checks.

On April 16, 1998, Benjamin purchased a bank check for $10,900 from Citizens Bank. This check was made payable to Benjamin, and the name "Ralph Chapel" was noted on the line of the check marked "memo." Benjamin purchased a second bank check for $17,000 from BankBoston on April 17, also made payable to "Lyndon Benjamin." Benjamin used these checks to purchase a 1998 Lexus in his own name.

On May 11, 1998, two checks totaling approximately $180,000 were deposited into the Eastside Motorsports account. Surveillance photos from the bank indicated that Benjamin made these deposits. One of the checks, in the amount of approximately $170,000, was made payable to Ben & Jerry's, and the other check, in the amount of approximately $10,000, was made payable to Clearmount Corporation. Representatives from these companies testified that Benjamin was not authorized to obtain these funds or deposit them into the Eastside Motorsports account.

During this time, Benjamin, as Ralph Chapel, also cashed six checks from Prime Speed, the auto parts business to which he had written two checks of $25,000 each on the day that DeCosta first deposited large sums of money into the Eastside

-4-

Motorsports account.  These six checks, ranging in amount from $2,000 to $19,900, were all made payable to Ralph Chapel, doing business as Eastside Motorsports.  The checks were cashed by Benjamin using the name Ralph Chapel and his Massachusetts identification card.  Kevin Primus, the owner of Prime Speed, testified that these checks were refunds to Benjamin of deposits he had made for auto parts that Primus was subsequently not able to obtain from his suppliers.

A nine-count indictment was returned against Benjamin on September 23, 1998.  Count one charged him with bank fraud in violation of 18 U.S.C. § 1344.  Counts two through seven charged him with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[2]  Counts eight and nine charged Benjamin with engaging in monetary transactions over $10,000 with property derived from a specified unlawful activity, in violation of 18 U.S.C. § 1957(a) and aiding and abetting that offense, in violation of 18 U.S.C. § 2.  Following a six-day trial in April 1999, a jury convicted Benjamin of counts one, eight, and nine. He was sentenced in November 1999 to three years in prison and ordered to make restitution to Fleet Bank of approximately $160,000.

---

[2] The jury acquitted Benjamin of the six counts of money laundering.

-5-

Benjamin makes the following arguments on appeal: 1) the evidence was insufficient to support his convictions; 2) the district court improperly instructed the jury; 3) there was a variance between the allegations in the indictment and the proof offered at trial; 4) the government failed to disclose exculpatory evidence; 5) African-Americans were underrepresented on Benjamin's jury venire; and 6) he was denied effective assistance of counsel. Benjamin has not appealed his sentence or the order that he pay restitution. We reject his claims and affirm his convictions.

## II. Sufficiency of the Evidence

Following the close of the government's evidence, and at the end of the trial, Benjamin moved unsuccessfully for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. In considering Benjamin's challenge to the sufficiency of the evidence on appeal, we view the evidence and draw all inferences in the light most favorable to the prosecution. See United States v. Baldyga, 233 F.3d 674, 678 (1st Cir. 2000). "The evidence is legally sufficient so long as, taken as a whole, it warrants a judgment of conviction." Id. We examine both direct and circumstantial evidence in making this evaluation. Id.

### A. Bank Fraud

In Count One of the indictment, the government charged that Benjamin

> did knowingly execute and attempt to execute a scheme and artifice to defraud Fleet Bank, a federally insured financial institution, and to obtain money owned by and under the custody and control of Fleet Bank, by means of false and fraudulent pretenses, representations and promises, in that he deposited into a fraudulently opened account at Fleet Bank checks he knew to be stolen and to contain forged endorsements; and then withdrew or otherwise transferred out of the account a portion of the monies so deposited and credited to the fraudulent account.

"To prove bank fraud under 18 U.S.C. § 1344,[3] the prosecution must show beyond a reasonable doubt that the defendant (1) engaged in a scheme or artifice to defraud, or made false statements or misrepresentations to obtain money from; (2) a federally insured financial institution; and (3) did so knowingly." United States v. Brandon, 17 F.3d 409, 424 (1st Cir. 1994). See also United States v. Kenrick, 221 F.3d 19, 30 (1st Cir. 2000). A scheme or artifice to defraud is "any plan,

---

[3] The bank fraud statute, 18 U.S.C. § 1344, provides:
Whoever knowingly executes, or attempts to execute, a scheme or artifice--
(1) to defraud a financial institution; or
(2) to obtain any of the money, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

pattern or course of action, including false and fraudulent pretenses and misrepresentations intended to deceive others in order to obtain something of value." United States v. Blasini-Lluberas, 169 F.3d 57, 65 (1st Cir. 1999) (quotations omitted). The prosecution must prove that the scheme involved a material falsehood, and that the defendant had an intent to defraud the bank. See Kenrick, 221 F.3d at 30. We have defined "intent to defraud" as "an intent to deceive the bank in order to obtain from it money or other property." Id.

We find ample evidence of Benjamin's intent to deceive Fleet Bank. Maggelet testified that Benjamin opened an account at Fleet under a false name and social security number, and that the business, Eastside Motorsports, in whose name the account was opened, did not actually exist. An employee of Stratus Computer testified that neither DeCosta nor Benjamin was authorized to cash or deposit the two checks totaling over $200,000, made payable to Stratus Computer, into the Eastside Motorsports account. Notwithstanding Benjamin's contention that he did not know the money deposited by DeCosta was stolen, the jury could have inferred Benjamin's awareness of this fraudulent transaction, and acquiescence to it, from DeCosta's use of the pre-printed deposit slip for the Eastside Motorsports account (presumably issued to Benjamin, as Ralph Chapel, after he opened

-8-

the account) and the fact that Benjamin wrote three checks totaling $80,000 withdrawing money from the account later that same day.  Surveillance photos at the bank indicated that Benjamin himself deposited two large checks into the account on May 11, 1998.  Employees of the companies to which those checks were made payable testified that Benjamin was not authorized to deposit those checks, with fraudulent endorsements, into the Eastside Motorsports account.

The jury could have found further that this deception and DeCosta's deposit were intended to obtain something of value from the bank because the Eastside Motorsports account was credited for over $370,000 as a result of the deposits Benjamin and DeCosta made.  Benjamin benefitted further from the scheme through his withdrawal from the account of large amounts of the stolen funds he had deposited there, using the false name Ralph Chapel.

**B. Engaging in Monetary Transactions Over $10,000 in Property Derived From a Specified Unlawful Activity**

Counts eight and nine charged Benjamin with violating 18 U.S.C. § 1957, which criminalizes "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and . . . derived from specified unlawful activity."  Specifically, count eight charged a monetary transaction on April 16, 1998 involving

a Citizens Bank check made payable to Lyndon Benjamin in the amount of $10,893.60. Count nine charged a monetary transaction on April 17, 1998 involving a BankBoston check made payable to Lyndon Benjamin in the amount of $17,000. The government had to establish in the circumstances of this case that the money used to purchase the bank checks could be linked to the account Benjamin had fraudulently established at Fleet Bank and funded with stolen money.

Benjamin cites three deficiencies in the § 1957 evidence. He claims that the government failed to prove: (1) that he knew the property was derived from a specified unlawful activity; (2) that he knew the transactions involved criminally derived property; and (3) that the two monetary transactions involving the bank checks affected interstate commerce. In United States v. Richard, 234 F.3d 763 (1st Cir. 2000), we considered the prosecution's burden of proof for the elements of § 1957 relating to "specified unlawful activity" and "criminally derived property":

> A defendant may not be convicted under section 1957(a) unless he knew that the transaction involved "criminally derived property," but he need not know that the property was derived from the "specified unlawful activity." 18 U.S.C. § 1957(c). In other words, the government must prove (1) that [the defendant] had general knowledge of the subject property's criminal nature, and (2) that the property, in fact,

-10-

was derived from a specified offense listed in 18 U.S.C. § 1956(c)(7). 18 U.S.C. § 1957(f)(3). The government need not prove that [the defendant] had knowledge of the specified offense, or that he committed it.

Richard, 234 F.3d at 769. We discuss the elements of the offense in turn.

### 1. Property derived from a specified unlawful activity

We easily dispose of Benjamin's argument that the government had to prove that he knew the two bank checks were derived from a specified unlawful activity. This claim misreads the plain language of § 1957. Subsection (c) of that statute states: "the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." 18 U.S.C. § 1957(c). See also United States v. Gabriele, 63 F.3d 61, 65 (1st Cir. 1995). It is sufficient under § 1957 that the two bank checks were, in fact, derived from bank fraud, which is listed in 18 U.S.C. § 1956(c)(7) as a specified unlawful activity. Benjamin's lack of knowledge that bank fraud is among the enumerated activities was irrelevant.

As we have explained in the preceding section, there was ample evidence from which the jury could have concluded that Benjamin committed bank fraud when he opened the account with an assumed name, presented stolen checks for deposit, asked that

-11-

the funds be credited to the Eastside Motorsports account, and, as Ralph Chapel, obtained cash from the funds in this account either by writing checks drawn on the account directly to cash, or by writing large checks to Prime Speed and receiving checks back from Prime Speed which he then cashed. More specifically, Benjamin cashed a check for approximately $19,900 from Prime Speed on April 14. Benjamin also withdrew $8,700 in cash from the Eastside Motorsports account in two transactions on April 13 and April 14. Thus, Benjamin had a total of $28,600 cash in his possession only a few days before he obtained bank checks on April 16 and April 17 for $10,900 and $17,000, respectively. Based on this evidence, the jury could have inferred that Benjamin used that cash, which was derived from bank fraud, to obtain the two bank checks. Thus, the jury could have concluded that the two bank checks charged in counts eight and nine were in fact drawn on funds obtained from a specified unlawful activity.[4]

---

[4] While the government did not have to prove that Benjamin knew the property was derived from a specified unlawful activity, the district court instructed the jury that they needed to find "that the defendant knew the property was derived from bank fraud." The court acknowledged at a later proceeding that this instruction improperly increased the burden for the government. Thus, while there was no need for the government to prove Benjamin's knowledge on this point, the improper instruction likely meant that the jury found that Benjamin had such knowledge. Even if he did not have that knowledge, however, that fact does not affect our analysis of the

## 2. Criminally derived property

Next, Benjamin argues that the government failed to prove that he knew that the transactions involved criminally derived property. Section 1957 defines "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). We have interpreted this element to require a defendant to have "general knowledge of the subject property's criminal nature." Richard, 234 F.3d at 769. Benjamin's conviction for bank fraud provided evidence that he realized the funds originally in the Eastside Motorsports account - which were then used to obtain the bank checks - were derived from criminal activity.

Benjamin does not persuade us otherwise. He claims that the issuance of the bank checks in his own name, and his use of the checks to purchase a car in his own name, indicate his lack of knowledge that the funds were criminally derived. However, Benjamin's use of his own name for these transactions is irrelevant. The subject property at issue for the monetary

---

sufficiency of the evidence under § 1957 because we consider what the jury needed to find as though it had been instructed properly. As we have held, "[a] patently erroneous . . . instruction does not establish the standard by which we measure the sufficiency of the evidence on appeal." United States v. Zanghi, 189 F.3d 71, 80 (1st Cir. 1999).

transactions charged in counts eight and nine is the money used to obtain the bank checks. As we have explained, those funds were criminally derived because they originally arrived in the Eastside Motorsports account as a product of bank fraud.

Benjamin also claims that there is "no evidence, that the defendant was aware of the nature, location, source, ownership or control of the checks deposited by DeCosta." However, those unauthorized deposits of stolen checks were made with deposit slips pre-printed with the account information for the Eastside Motorsports account. Benjamin does not dispute that he was responsible for opening that account and that he did so using a false name and a false social security number. Because Benjamin opened the account, the jury reasonably could have found that Benjamin was aware of DeCosta's deposits into the account using the pre-printed slips provided by the bank. Additionally, Benjamin, signing checks as Ralph Chapel, wrote three checks totaling $80,000 from the account later in the same day that DeCosta deposited the two stolen checks. These circumstances reasonably could lead rational jurors to conclude that Benjamin realized that the funds in the Eastside Motorsports account were derived from some activity of a criminal or fraudulent nature. See, e.g., Richard, 234 F.3d at 769 (upholding conviction under § 1957 where "[b]ased upon [the

-14-

defendant's] convictions of both mail fraud and securities fraud, it is clear that he had sufficient knowledge that the money he received from his investors - the subject property - was criminally derived"); United States v. Butler, 211 F.3d 826, 830 (4th Cir. 2000) (finding that five cashiers' checks drawn on funds obtained through bankruptcy fraud constituted "criminally derived property").  As we discussed above, there was also evidence regarding Benjamin's cash withdrawals and cashing of other checks from which the jury could have inferred that the two bank checks were drawn on funds that were derived from the bank fraud.  Therefore, we find the evidence sufficient for the jury to have found that Benjamin realized the bank checks were property derived from criminal activity.

### 3. Monetary transaction affecting interstate commerce

Finally, Benjamin claims that the monetary transactions did not have the requisite connection to interstate commerce. Section 1957(f) defines "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution."  18 U.S.C. § 1957(f)(1). Section 1957(f) only requires that the transactions have a de minimis effect on commerce.  See United States v. Owens, 167 F.3d 739, 754 (1st Cir. 1999) (construing 18 U.S.C.

§ 1956).[5]  As proof on this point, the government offered Fleet Bank's certificate of insurance issued by the Federal Deposit Insurance Corporation (FDIC).  This document, certifying that the bank is federally insured, suffices to satisfy the requirement that the transactions had at least a minimal impact on interstate commerce.  See United States v. Ford, 184 F.3d 566, 584 (6th Cir. 1999) (construing 18 U.S.C. § 1956 and § 1957).

### III. Jury Instructions

Benjamin objects to the jury instructions on two grounds.  He argues first that the district court omitted an instruction on the materiality of the fraud in its instructions on bank fraud.  Second, Benjamin claims that the court's instructions on § 1957 did not require the jury to find the requisite connection between the monetary transaction and interstate commerce.  Because Benjamin did not raise these objections before the district court, our review is for plain error.  See Fed. R. Crim. P. 52(b); see also United States v. Olano, 507 U.S. 725, 731 (1993); Baldyga, 233 F.3d at 680. Thus, before deciding that any error requires a new trial, we must find that the error  affected Benjamin's substantial rights

---

[5] The interstate commerce element of § 1957 and § 1956 (money laundering) has been construed similarly.  See, e.g., United States v. Ford, 184 F.3d 566, 583 (6th Cir. 1999).

by affecting the outcome of the trial.  See Olano, 507 U.S. at 731; Baldyga, 233 F.3d at 682.

## A. Bank Fraud Instruction

As the government concedes, the district court did not instruct the jury that materiality was a required element of the "scheme or artifice to defraud" prong of bank fraud under § 1344(1).[6]  Since the time of Benjamin's trial, the Supreme Court has declared that materiality is an element of bank fraud in proving that a defendant engaged in a scheme or artifice to defraud.  See United States v. Neder, 527 U.S. 1, 25 (1999); United States v. Colon-Munoz, 192 F.3d 210, 221 (1st Cir. 1999).  Thus, the court's failure to instruct the jury on this point was error.  As we noted above, Benjamin's failure to object to this omission means that we will correct the error only if we conclude that it affected his substantial rights.  See Olano, 507 U.S. at 731.  To answer this question, we must determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." Neder, 527 U.S. at 19.  See also Baldyga, 233 F.3d at 682.

---

[6] Under the false pretenses prong of bank fraud, § 1344(2), the district court did instruct the jury that the false representations needed to "relate to a material aspect of the transaction in question."  Thus, Benjamin challenges the jury instructions on only one of the two prongs of the statute.

In Neder, the Court defined a matter as "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." Neder, 527 U.S. at 222 n.5 (quoting Restatement (Second) of Torts § 538 (1976)). We find that the jury, properly instructed on this issue, easily would have found Benjamin's use of a false identification card and phony business to be material. In making the unauthorized deposits into and withdrawals out of the account, Benjamin further represented that he was Ralph Chapel and implicitly represented that he was authorized to cash or deposit the stolen checks. Fleet Bank likely would have found Benjamin's use of false identifying information important in determining whether the institution would allow him to become a banking customer and whether the bank would credit his account for the amount of the stolen checks he and DeCosta presented for deposit. Thus, the record does not contain evidence that could have led a rational jury to reach a contrary finding on materiality.

**B. Jury Instruction on Engaging in Monetary Transactions Over $10,000 in Property Derived from Unlawful Activity**

Benjamin's objection to the jury instructions on these counts is similar to his challenge to the sufficiency of the evidence: he argues that the district court instructed the jury in a way that allowed it to find him guilty without determining

that the two transactions affected interstate commerce. Contrary to his claim, however, the district court instructed the jury properly. As part of its explanation of "monetary transaction," the court stated: "The term monetary transaction means the deposit, withdrawal, transfer, or exchange in or affecting interstate or foreign commerce of funds or a monetary instrument by or through - by, through, or to a financial institution." The jury received an additional instruction on this point after it requested a clarification during its deliberations on the definition of interstate commerce. In response to this inquiry, the district court instructed the jury, in part, as follows:

> [Y]ou must still find that the transactions had at least a minimal effect on interstate commerce; that is, that the activities affected commerce in any way or degree.
> Now, the interstate commerce element can be established in several ways. First, if you find that the government has proved bank fraud as alleged in Count 1 of the indictment, you are free to consider whether or not the bank fraud, which is the specified unlawful activity designated in Counts 2 through 7 [the money laundering counts], affected interstate commerce.
> Second, you are free to consider, if you find that an initial deposit of funds was made to Fleet Bank, whether that initial deposit of checks was to an FDIC-insured financial institution.
> Third, you are free to consider whether or not the source of that initial

-19-

> deposit to Fleet Bank affected interstate commerce in any way or degree.

We discern no error in this instruction. As we have explained, § 1957 requires only that the monetary transaction have a de minimis effect on interstate commerce. See Owens, 167 F.3d at 754. The theory of the government's case was that the four stolen checks deposited in the Eastside Motorsports account at Fleet Bank provided the funds for the purchase of the two bank checks at issue in counts eight and nine. Therefore, the instruction that the jury could find that these initial deposits of stolen funds had a de minimis effect on interstate commerce - either because the bank to which they were deposited was FDIC-insured or because the source of that deposit actually affected interstate commerce to any degree - adequately described the requirements of § 1957.

## IV. Variance

Benjamin argues that there was a variance between what was alleged in count one of the indictment, charging him with bank fraud, and the proof offered at trial. We will reverse a conviction for this reason only where "the variance works a substantial interference with the defendant's right to be informed of the charges." United States v. Arcadipane, 41 F.3d 1, 6 (1st Cir. 1994). We consider this question de novo. See United States v. Portela, 167 F.3d 687, 700 (1st Cir. 1999).

-20-

Benjamin seems to argue in his brief that a variance existed because the indictment charged him with bank fraud, requiring the prosecution to prove that he personally deposited all of the checks involved, while the evidence demonstrated that Ian DeCosta made the two-check deposit on April 9. However, count one of the indictment charged Benjamin with bank fraud under 18 U.S.C. § 1344, as well as with aiding and abetting that crime, in violation of 18 U.S.C. § 2. There is no requirement that a defendant personally commit an act to be held responsible for aiding and abetting the commission of that act. See Colon-Munoz, 192 F.3d at 223; United States v. Loder, 23 F.3d 586, 590-91 (1st Cir. 1994). The indictment alleged that Benjamin engaged in a scheme to defraud Fleet Bank, and the evidence at trial was offered to prove exactly that scheme. We thus conclude that the indictment provided adequate notice to Benjamin, and there was no variance in the proof offered.

## V. Exculpatory Evidence

Benjamin claims that the district court erred in denying his motion for a new trial based on the government's failure to disclose handwriting exemplars he gave at the time of his arrest in violation of Brady v. Maryland, 373 U.S. 83 (1963). We review the district court's denial of his motion for

an abuse of discretion.  See United States v. Montilla Rivera, 171 F.3d 37, 40 (1st Cir. 1999).

The handwriting samples at issue here were taken at the time of Benjamin's arrest as part of routine Secret Service procedures.  The government never analyzed the samples or introduced them at trial.  Benjamin requested them in September 1999 following his conviction, and the record indicates that counsel for the government had not been aware of the exemplars (presumably because they were never analyzed or used for any purpose) prior to Benjamin's request.  While it was the government's position then, and remains now, that it was not required to produce the handwriting samples because they were not analyzed or even used, counsel nonetheless responded promptly to Benjamin's letter and produced the exemplars.

The prosecution is obligated to provide a defendant access to material exculpatory evidence that is in its control. See United States v. Bagley, 473 U.S. 667, 675-76 (1985); Brady, 373 U.S. at 87.  Evidence is material only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Bagley, 473 U.S. at 682.  A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome."  Id.

We conclude easily that Benjamin received a fair trial without presenting the handwriting exemplars for the jury's consideration. He has not even attempted to explain how the samples are material in the sense that they undermine confidence in the jury's verdict of guilty. Indeed, as noted, the exemplars were never analyzed or used as part of the prosecution's case. The case against Benjamin did not rest on an identification of his handwriting. Thus, we find that no Brady violation occurred.

**VI. Underrepresentation of African-Americans in the Jury Venire**

Benjamin, who is African-American, claims that the underrepresentation of African-Americans in his jury venire violated his rights under the Sixth Amendment and the Jury Selection and Service Act, 28 U.S.C. § 1861. Guided by our recent decision in United States v. Royal, 174 F.3d 1 (1st Cir. 1999), we reject this argument.

"[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 527 (1975). This requirement is fundamental to the right to jury trial guaranteed by the Sixth Amendment. See id. at 530; Royal, 174 F.3d at 6. To make a prima facie case that the right to a jury drawn from a fair

-23-

cross-section of the community has been violated, a defendant must establish the following:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
> (3) that this underrepresentation is due to systematic exclusion of the group in the jury- selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979). See also Royal, 174 F.3d at 6.

In Royal, as here, the defendant argued that he was entitled to a new trial because the jury selection process for the District of Massachusetts produced a systematic under-representation of African-American jurors. Royal was allowed to inspect the jury records for 1994 to investigate his claim, and he retained an expert to analyze this data. See Royal, 174 F.3d at 4-5. We noted at the outset of that opinion that "[t]here is no dispute that Royal has satisfied the first prong of [the Duren] test; blacks are unquestionably a 'distinctive' group for the purpose of a fair cross-section analysis." Id. at 6. Thus, we turn to the second prong of the Duren test to analyze Benjamin's claim.

We need not discuss the complicated mathematical analyses we considered in Royal. For the purpose of evaluating

-24-

Benjamin's claim, we rely on our conclusion that the statistics about the jury selection procedure in Massachusetts were "insufficient to satisfy Royal's burden under the second prong of Duren."  Royal, 174 F.3d at 11.  Benjamin attempts to avoid this result by claiming only that the statistical analysis in Royal "uses outdated numbers from 1994."  However, he has not articulated even a vague reason to suspect that the statistics discussed in Royal are no longer accurate, let alone that such different statistics, if they existed, would suffice to establish a violation under Duren.  In sum, Benjamin has not explained why Royal should not guide our analysis here.  Accordingly, we cannot conclude that the representation of African-Americans in the jury venires "is not fair and reasonable in relation to the number of such persons in the community."  Duren, 439 U.S. at 364.[7]

## VII. Ineffective Assistance of Counsel

Finally, Benjamin argues that his Sixth Amendment rights were violated by the ineffective assistance of his trial lawyer.  However, "[w]e have held with a regularity bordering on the monotonous that fact-specific claims of ineffective

---

[7]  Because we find that Benjamin's claim falters on the second prong of the Duren test, we do not consider whether the alleged underrepresentation of African-Americans in the jury venires results from their systematic exclusion from the jury selection process.  See Royal, 174 F.3d at 11.

assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993); see also United States v. Berrios, 132 F.3d 834, 841 (1st Cir. 1998). Although we have occasionally reviewed ineffective assistance claims on direct appeal, "we travel this route only when the critical facts are not in dispute and the record is sufficiently developed to allow reasoned consideration of the claim." Mala, 7 F.3d at 1063. Concluding that this is not such a case, we decline to consider Benjamin's claim. This action, of course, is without prejudice to Benjamin's right to raise the ineffective assistance of counsel claim in a proceeding for post-conviction relief.

## VIII. Conclusion

For the foregoing reasons, we affirm Benjamin's convictions.

**Affirmed.**

-26-