UNITED STATES of America,
Appellee,

v.

Karen M. McGAULEY, Defendant,
Appellant.

No. 00–2057.

United States Court of Appeals,
First Circuit.

Submitted Sept. 13, 2001.

Decided Feb. 5, 2002.

Jeremiah P. Sullivan, Jr., with whom Sullivan and McDermott were on brief, for appellant.

James B. Farmer, United States Attorney, with whom Antoinette E.M. Leoney, Assistant United States Attorney, was on brief, for appellee.

Before SELYA, Circuit Judge, LIPEZ, Circuit Judge, and DOUMAR,* Senior District Judge.

LIPEZ, Circuit Judge.

Karen McGauley was convicted on numerous counts of making false statements to the United States Postal Service, under 18 U.S.C. § 1001; misrepresentation of social security numbers, under 42 U.S.C. § 408(a)(7)(B); mail fraud, under 18 U.S.C. § 1341; and money laundering, under 18 U.S.C. § 1956(a)(1)(B). She was also ordered to forfeit $243,087.42 to the United States, pursuant to 18 U.S.C. § 982(a)(1). McGauley appeals on several grounds, one of which requires us to decide whether 18 U.S.C. § 982(a)(1) authorizes the forfeiture of legitimate funds that have been commingled with the proceeds of unlawful activity for the purpose of concealing those proceeds. Concluding that it does, we affirm.

## I. Background

Before examining the evidence supporting McGauley's conviction in greater detail, we briefly summarize the facts of this case, viewing the evidence in the light most favorable to the verdict. Between 1991 and 1997 McGauley, a resident of Yarmouthport, Massachusetts, returned large volumes of merchandise, most of it women's clothing, to numerous retail stores in exchange for refunds. In most instances McGauley received a refund check in the mail, although sometimes the refund would be issued to one of her credit cards, creating a credit balance which would result at some point in a check being mailed to McGauley. She received these refund checks under numerous names and at various addresses, including five United States post office boxes which she had opened under false names and false social security numbers. In total, McGauley received 220 refund checks amounting to $55,296.28. There was no direct evidence, however, that the specific items McGauley returned in exchange for these refund checks had been stolen.

* Of the Eastern District of Virginia, sitting by designation.

In July of 1997, Massachusetts State Police searched McGauley's home, where they discovered "piles and piles of clothing with one room stacked to the ceiling that you couldn't walk into, all brand new in various piles all over the house." No sales receipts were found. A State Trooper testified that McGauley "said she had a problem with kleptomania and she couldn't control herself." Less than two weeks after the search of her home in July of 1997, McGauley initiated a series of transactions that continued into October, resulting in the withdrawal of over $300,000 from bank accounts into which she had deposited refund checks.[1] She deposited these funds into new accounts, held jointly with her parents, from which she then made substantial withdrawals over the next two months.

In February of 1998 McGauley was charged with five counts of making false statements to the U.S. Postal Service, in violation of 18 U.S.C. § 1001; five counts of misrepresentation of social security numbers, in violation of 42 U.S.C. § 408(a)(7)(B); 25 counts of mail fraud, in violation of 18 U.S.C. § 1341; and six counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The indictment alleged that McGauley should forfeit to the United States those funds that were involved in or traceable to her money laundering activities, pursuant to 18 U.S.C. § 982(a)(1). In the interest of efficiency, the government (pursuant to the district court's request) pared down the mail fraud portion of the indictment to three counts: a refund check for $433.00 from Talbots, issued to McGauley under the name "Gale Peterson" on July 11, 1995; a refund check for $113.93 from Talbot's, issued to McGauley under the name "Steven Ryan"

on November 10, 1995; and a refund check for $5,386.84 from Citibank VISA, issued to McGauley on October 28, 1997. The evidence at trial, however, included 217 other refund checks not charged in the indictment.

The trial began on February 14, 2000. On February 25, the jury found McGauley guilty of all charges except for one money laundering count. At a subsequent forfeiture hearing on February 28, the jury found that $243,087.42 was subject to forfeiture to the United States. On July 19, 2000, McGauley received a sentence of 24 months imprisonment (stayed pending this appeal) and five years of supervised release, plus a fine of $10,000, an order to pay restitution in the amount of $55,296.30, and forfeiture of $243,087.42.

On appeal, McGauley argues that the evidence was insufficient to support the verdict; that the district court erred in several of its evidentiary rulings; and that forfeiture, if any, should have been limited to the amount of the proceeds of her mail fraud scheme, rather than encompassing the legitimate funds with which she commingled those proceeds in the course of her money laundering transactions.

## II. Sufficiency of the Evidence

After the government had presented its case, and again after the verdict, McGauley moved unsuccessfully for a judgment of acquittal pursuant to Fed. R.Crim.P. 29. In weighing a challenge to the sufficiency of the evidence, we view the evidence and draw all reasonable inferences in the light most favorable to the verdict. *United States v. Benjamin*, 252 F.3d 1, 5 (1st Cir.2001). The evidence is

---

1. To be precise, one of the withdrawals was made from an account into which McGauley, in 1996, had deposited the contents of an earlier account into which she had deposited numerous refund checks.

legally sufficient if, taken as a whole, it warrants a judgment of conviction. *Id.*

## A. Mail Fraud

 To prove mail fraud, the government must establish "(1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails ... in furtherance of the scheme." *United States v. Woodward,* 149 F.3d 46, 54 (1st Cir.1998) (internal quotation marks omitted). The government charged McGauley with designing and executing a scheme to defraud retail stores by stealing merchandise and then returning it in exchange for mailed refund checks. McGauley argues that the evidence at trial was insufficient to prove the existence of a scheme to defraud, and that even if there was such a scheme, the evidence was insufficient to establish that she elicited the specific refund checks charged in the indictment pursuant to it.

### i. Existence of a Scheme to Defraud

McGauley argues that the government failed to prove a scheme to defraud because "[t]hree checks over a two year period ... [does] not equal a scheme." The evidence at trial, however, went far beyond the three refund checks charged in the indictment. Between August of 1991 and October of 1997, McGauley—who between 1992 and 1996 earned no more than $25,000 per year as a part-time licensed practical nurse at Cape Cod Hospital—received and deposited 220 refund checks for a total of $55,296.28 into her bank accounts. The refund checks were made out to McGauley or to one of approximately 30 other names which she used as aliases. The stores that issued these refund checks were Talbots, Filene's, Victoria's Secret, Eddie Bauer, Jordan Marsh, Macy's, Ann Taylor, The Museum of Fine

Arts, Laura Ashley, Starbucks, J.C. Penney, Henri Bendel, Lord & Taylor, L.L. Bean, Lechter's, Signature Stores, and Whitehall Robbins. The banks and credit card companies that issued refund checks were Citibank VISA, Chase Manhattan, Discover, and Bank of New York, Delaware. McGauley also received a refund check from United Parcel Service.

Employees testified that it was the policy of these stores to mail refund checks to customers who returned merchandise without a sales receipt or other proof of purchase. The general rule was that if the purchase had been made with cash, a refund check would be mailed to the customer; if the purchase had been made with a credit card the refund would be credited to the same card. However, exceptions to this rule were often made, and refunds were sometimes put on credit cards that McGauley had *not* used to purchase the returned items.

United States Postal Inspector Joseph Kleinberg testified that McGauley's bank records, which documented her receipt of the 220 refund checks for returned merchandise, contained no record of McGauley having made any purchases at the stores to which she returned merchandise. Likewise, there was evidence that McGauley had received refunds on her credit cards in amounts far exceeding the purchases she made, and that she had made no payments on the credit cards that issued her refund checks.

Although the government offered no direct evidence that McGauley had stolen the items she returned for the three refund checks charged in the indictment, there was evidence at trial sufficient to support the conclusion that McGauley stole substantial quantities of merchandise from the retail establishments that issued refund checks to her. Massachusetts State Trooper Robert Knott testified that a

search of McGauley's home on July 10, 1997 had revealed "a large quantity of clothing." He explained:

> In various rooms of the house were piles and piles of clothing with one room stacked to the ceiling that you couldn't walk into, all brand new in various piles all over the house. It still had tags on it. It was such a quantity that we sent for a truck to haul it away.

Even with the truck, only about 20 percent of the clothing found in McGauley's home was seized. The search revealed no sales receipts that corresponded to the clothing, although it did turn up numerous documents pertaining to refunds. In McGauley's car, the State Police found various price tags, folded-up shopping bags, and plastic hooks and a plastic price tag gun of the type used to affix price tags to fabric.

In response to State Police questioning during the search of her home and car, McGauley indicated "that she had a shopping disorder." When her interrogator suggested that "it was a little more involved than that," and elaborated as to the extent of his investigation, "[s]he said she had a problem with kleptomania and she couldn't control herself."

There was evidence at trial that McGauley had committed three specific acts of shoplifting. In 1992, a T.J. Maxx security officer observed McGauley removing watches from a store without paying for them. In 1996, a Macy's store detective observed McGauley placing pillow cases and draperies into a shopping bag, which she then "returned" at a register for a mailed refund check. In 1997, Massachusetts State Police, with the assistance of store employees, determined that McGauley had replaced a $119.99 price tag on a green sweater at the women's clothing store Ragg Time with a $45.99 price tag, which she then purchased at the lower price using a store credit issued under an alias.

Based on this evidence, which amounts to far more than "[t]hree checks over a two year period," a reasonable jury could have found that McGauley designed and executed a scheme to defraud retail stores by stealing merchandise and then returning it for mailed refund checks or credit on her credit cards.

### ii. The Specific Mailings Charged

█ Even if the evidence supports a finding that McGauley designed and executed a general scheme to defraud, she argues that there is no evidence that the specific refund checks charged in the indictment were issued in exchange for stolen merchandise. Viewed in the light most favorable to the verdict, however, the evidence is sufficient to support a finding that the returned items underlying the three charged refund checks were stolen.

Counts 11 and 12 of the indictment pertain to Talbots refund checks payable to McGauley aliases "Gale Peterson" ($433.00) and "Steven Ryan" ($113.93). Between January of 1993 and April of 1997, Talbots issued $8,512.73 in refund checks to McGauley under her various aliases. An employee testified that, in addition to the two refund checks charged in the indictment, Talbots issued refunds between 1994 and 1996 to numerous McGauley aliases, including Dana Peterson, Mary Lou Tully, Rita Chuplis, Susan Ryan, Joan Higgins, Terry Higgins, and Ann Sullivan. There was evidence of telephone conversations and correspondence between Talbots and McGauley (under various names) concerning her failure to submit sales receipts with merchandise returns. There was also testimony that McGauley never made a payment on her Talbots charge card because returns credited to the account far exceeded purchases, and that in 1996 Tal-

bots sent McGauley a check in the amount of her credit balance. Based on this evidence, and the evidence described above that McGauley had designed and executed a general scheme to defraud retail establishments, a reasonable jury could have found that the returned merchandise underlying Counts 11 and 12 of the indictment had been stolen by McGauley.

Count 13 of the indictment pertains to a check for $5,386.84 from Citibank VISA payable to McGauley. The check was issued to extinguish a large credit balance on McGauley's account, representing merchandise returns. Based on the voluminous evidence of a general scheme to defraud retail stores, a reasonable jury could have found that McGauley had stolen the items she returned to generate the credits on her Citibank VISA account. In sum, there was ample evidence that the specific refund checks charged in the indictment were the product of McGauley's general scheme to defraud.

### B. False Statements to the United States Postal Service and Misrepresentation of Social Security Numbers

McGauley argues that her convictions for making false statements to the United States Postal Service should be overturned because the government offered no evidence that the post office boxes, which she admits to having opened under names other than her own, were opened for a fraudulent purpose. She argues that her convictions for use of false social security numbers should be overturned for the same reason: the government offered no evidence that she used false social security

numbers for the purpose of obtaining a payment to which she was not entitled.

 To establish a violation of 18 U.S.C. § 1001, the government must prove that the defendant knowingly and willfully made or used a false writing or document, in relation to a matter within the jurisdiction of the United States government, with knowledge of its falsity. *See United States v. Duclos*, 214 F.3d 27, 33 (1st Cir. 2000). There is no requirement that the government prove that the statement was made for a fraudulent purpose, and McGauley cites no authority to support her contention to the contrary. Nor does 42 U.S.C. § 408(a)(7)(B) [2]—which proscribes the use, with intent to deceive, of a false social security number—require that the social security number be used for the purpose of obtaining a payment to which the user is not entitled. Although the statute does contain language consistent with McGauley's formulation, it also proscribes the use of a false social security number "for any other purpose." [3]

### C. Money Laundering

 To prove a violation of 18 U.S.C. § 1956(a)(1)(B)(i), the government must show that McGauley conducted financial transactions involving the proceeds of unlawful activity, knowing that the transactions involved the proceeds of unlawful activity, and that the transactions were designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i); *see United States v. Kneeland*, 148 F.3d 6, 17 (1st Cir.1998). Taking the evidence in the light most favorable to the verdict, we conclude that

**2.** At the time of two of the charged misrepresentations this statute was designated as § 408(g)(2).

**3.** Moreover, with respect to both statutes, there was ample evidence at trial that McGauley *did* have a fraudulent purpose.

there was sufficient evidence to support the jury's verdict on the money laundering counts.

Postal Inspector Kleinberg testified that on July 10, 1997 the State Police searched McGauley's home. On July 22, McGauley closed Cape Cod Bank & Trust ("CCB & T") accounts # 2010028146 and # 174667702. She divided the contents of account # 2010028146 into two treasurer's checks, each in the amount of $41,645.92, and the contents of account # 174667702 into two treasurer's checks, each in the amount of $49,497.40. She then deposited one check from each CCB & T account into each of two new Fleet Bank accounts she opened jointly with her parents. That same day, McGauley closed Fleet Bank account # 9372976201 and deposited the contents ($2,532.32) into a third new Fleet Bank account she opened jointly with her parents. Subsequent to these transfers, between August 6 and September 2, McGauley withdrew over $130,000 from her new Fleet Bank accounts, including $42,500 in cash.

McGauley had used two of the three accounts she closed on July 22, 1997 as repositories for refund checks. She had deposited $6,437.17 in refund checks into account # 9372976201, and a refund check for $155.76 into account # 174667702. The third account McGauley closed on July 22, 1997, # 2010028146, had (in October 1996) received the contents of two earlier CCB & T accounts into which refund checks had been deposited: account # 133813720, into which $1,891.93 in refund checks had been deposited, and account # 174667701, into which over $35,000.00 in refund checks had been deposited.

There was also evidence that on July 25, 1997, two weeks after the search of her home, McGauley transferred $99,914.38 from an existing Sandwich Cooperative Bank account (held jointly with her mother), into which $2,097.51 in refund checks had been deposited, to a new account at the same bank held jointly with her mother and father. Over the next two months she withdrew approximately $100,000 from her new account, including over $30,000 in cash.[4]

In total, there was evidence that, within about two weeks of the search of her home, McGauley transferred $243,087.42 out of her existing bank accounts into new ones, with large subsequent disbursements made over the next two months from the new accounts. A reasonable jury could have found that McGauley knew these transactions involved proceeds of unlawful activities, and that their purpose was "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of [her mail fraud scheme]." 18 U.S.C. § 1956(a)(1)(B)(i). Although there was no direct evidence of intent to conceal, the evidence was sufficient to support an inference of such intent.

▬ Arguing that a money laundering conviction cannot be based on unlawful activity not charged in the indictment, McGauley claims that the scope of any money laundering conviction must be limited to the concealment of the three refund checks the government charged. However, "we do not require the indictment to specify the predicate offense underlying a money laundering charge." *United States*

---

**4.** The government also alleged that on October 28, four days after Inspector Kleinberg interviewed McGauley's parents, McGauley endorsed a Citibank VISA refund check in the amount of $5,386.84 over to her father, which he deposited, along with $70,000 in cash, into a Fleet Bank account. The next day, McGauley's mother wrote her a check for $67,710, which McGauley signed over to her attorney. McGauley was found not guilty on a money laundering count pertaining to these transactions.

*v. Mankarious,* 151 F.3d 694, 703 (7th Cir.1998); *see also United States v. Richard,* 234 F.3d 763, 768 (1st Cir.2000) (holding that a conviction under 18 U.S.C. § 1957 for engaging in monetary transactions in property derived from specified unlawful activity does not require that defendant also have been convicted of the underlying unlawful activity).

 McGauley also argues that the transfer of funds into accounts bearing *her own name* and the names of her parents "should not be considered a transaction to conceal or disguise these funds." Likewise, she suggests that the $99,914.38 she transferred from one Sandwich Cooperative Bank account to another account *at the same bank* could not have been an attempt to conceal or disguise funds. She cites no authority, however, for the proposition that one cannot endeavor to conceal funds by means of a transfer between accounts bearing one's own name, or between accounts at the same bank. As the district court said in response to a similar argument by McGauley's counsel at the sentencing hearing, "that's the traditional defense of, 'if I were a bank robber, I would have been better at it.'" Viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found that the extensive series of transactions McGauley initiated within two weeks of the search of her home was designed, however ineffectively, "to conceal or disguise" the nature and source of the proceeds of unlawful activity. 18 U.S.C. § 1956(a)(1)(B)(i).

McGauley's final challenge to the money laundering convictions pertains to Counts 15 and 16 of the indictment, alleging the withdrawal on July 22, 1997 of two checks for $49,497.40 from CCB & T account # 174667702, which she then deposited into two new Fleet Bank accounts she opened jointly with her parents. McGauley points out that just one refund check, in the amount of $155.76, had been deposited into CCB & T account # 174667702, and suggests: "No reasonable juror could conclude ... based upon the deposit of this one check [for $155.76] that the account from which Karen McGauley withdrew these two checks for $49,497.40 each was the proceeds of some form of unlawful activity."

Contrary to McGauley's argument, the government did not have to prove that the full amount of the two $49,497.40 checks constituted the proceeds of mail fraud. Such an interpretation of § 1956 would eviscerate the statute, permitting one to avoid its reach simply by commingling proceeds of unlawful activity with legitimate funds. Nor does McGauley cite authority for her implied proposition that there is a *de minimis* exception to § 1956 that removes from the money laundering prohibition transactions in which legitimate funds greatly outweigh illegitimate ones. The jury could have found that the checks drawn on CCB & T account # 174667702 included proceeds of mail fraud (the $155.76 check), and that the transactions were designed, in whole or in part, "to conceal or disguise" the nature, location, and source of those proceeds.[5] 18 U.S.C. § 1956(a)(1)(B)(i).

**5.** McGauley's argument that the transfer of $99,914.38 between two Sandwich Cooperative Bank accounts cannot qualify as money laundering, because just $2,097.51 in refund checks were deposited into that account, fails for the same reason. With respect to this transfer, her brief also contains a passing reference to a statute of limitations problem. Although McGauley did raise the statute of limitations below, she simply declares on appeal, without elaboration, that "the Statute of Limitations had run on these refunds.... The last deposit was on August 31, 1992 and the Defendant was indicted on February 11,

Even if McGauley could somehow establish that the withdrawal of funds from CCB & T account #174667702, by itself, did not constitute money laundering, her next move that same day was to commingle those funds with a much larger quantity of mail fraud proceeds. There was evidence that after McGauley withdrew the two checks for $49,497.40 from CCB & T account #174667702, she deposited them into two new Fleet bank accounts, commingling each with one of two checks for $20,822.96 (drawn on CCB & T account #2010028146) which the jury could have found were traceable in large measure to refund checks obtained via mail fraud.[6] In other words, the evidence was not just that McGauley moved $98,994.80 in order to conceal $155.76 of mail fraud proceeds; it also supported the conclusion that she used that $98,994.80 to conceal the much larger quantity of mail fraud proceeds with which she commingled it.

## III. Evidentiary Rulings

In McGauley's view, most of the evidence the government offered at trial should have been ruled inadmissible on the ground that it was not relevant to the three counts of mail fraud charged in the indictment. We review the decision of the district court to admit evidence for abuse of discretion. *See United States v. Gilbert,* 181 F.3d 152, 160 (1st Cir.1999).[7]

1998." "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990).

6. The two checks for $20,822.96 were drawn on (and constituted the entire contents of) CCB & T account #2010028146. The $41,645.92 in that account had come from two sources: $25,000 came from CCB & T account #174667701, into which McGauley had deposited over $35,000.00 in refund checks at the time of the transfer, and $15,291.91 came from CCB & T account

## A. The 217 Refund Checks Not Charged

McGauley argues that the 217 refund checks that were not charged in the indictment are irrelevant to the three charged counts of mail fraud. Her position seems to be that the government framed the three refund checks in the indictment as isolated criminal acts, and offered the other 217 checks as evidence of her propensity to elicit undeserved refunds. *See* Fed.R.Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). The indictment, however, charged McGauley with devising and executing *a scheme* for obtaining undeserved refunds, and the government is correct to observe that "because the evidence was part and parcel of the charged scheme, McGauley's FRE 404(b) [argument] is inapplicable." *See United States v. Santagata,* 924 F.2d 391, 394 (1st Cir.1991) ("Because the documents were admissible as direct proof of the scheme charged, application of Rule 404(b) was unnecessary.").

In *Santagata,* the defendant was convicted of wire fraud under 18 U.S.C. § 1343, an element of which is the existence of a scheme to defraud. 924 F.2d at 393. The defendant's scheme was to order

#133813720, into which she had deposited $1,891.93 in refund checks.

7. The government urges us to review McGauley's evidentiary claims for plain error, on the ground that she failed to renew at trial the objections she had advanced in pre-trial motions in limine. However, under Federal Rule of Evidence 103(a)(2), as amended in 2000, "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."

clothing under various aliases and then refuse to pay on the ground that he had been overcharged. *Id.* at 392–93. While the indictment listed fourteen specific dates on which the defendant executed his scheme, the government introduced evidence of clothing orders placed on dates not charged in the indictment. *Id.* at 393. We held that "[a]lthough these orders were not enumerated as separate, dated counts in ... the indictment, they nevertheless were relevant to the existence of a scheme and therefore were independently admissible." *Id.* at 393–94.

The situation here is analogous to *Santagata*. The government set out to prove not just that McGauley committed the three specific acts of mail fraud charged in the indictment, but that she did so pursuant to a general scheme to defraud retail establishments. The 217 refund checks to which McGauley objects were introduced not as "other crimes, wrongs, or acts" existing independent of the charged offense, but as proof that McGauley elicited the three refund checks charged in the indictment as part of a broader scheme to defraud retail establishments. Their relevance is plain.

McGauley insists that the 217 refund checks were "highly prejudicial, confused the issues, and misled the jury," and should therefore have been excluded under Fed.R.Evid. 403. While this evidence was obviously prejudicial to McGauley, because it pointed to the existence of an element of the mail fraud charge, "all evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided." *Santagata*, 924 F.2d at 394 (emphasis in original). McGauley's conclusory assertion of unfair prejudice and confusion affords no basis for questioning the district court's decision to admit this highly probative evidence.

### B. Items Found in McGauley's Home

McGauley also objects to the admission of Trooper Knott's testimony about the "piles and piles of clothing" found during a search of her home. She asserts that this evidence is irrelevant to the charges against her: "since the Government never introduced evidence as to what merchandise was stolen as part of the three mail fraud counts, there is *no* connection between any specific piece of merchandise found in the home and the charged offenses" (emphasis in original). She declares that the government introduced this evidence simply "to confuse and mislead the jury."

As just explained, however, the indictment charged that McGauley designed and executed *a scheme* to defraud, one element of which was stealing merchandise from retail stores. Evidence tending to show that McGauley had stolen large quantities of clothing is probative of the existence of such a scheme. *See Santagata*, 924 F.2d at 393–94. McGauley is therefore wrong to assert that "[t]he jury's attention was diverted [by this evidence] away from the elements the Government was required to prove to establish mail fraud."

McGauley also argues that the evidence discovered during the search of her home should have been excluded, "since a state court had already determined that it was neither evidence of nor proceeds of a crime and ordered the merchandise returned to [her]." The record reveals that on January 7, 1998, the Barnstable District Court granted McGauley's motion that the State Police return the seized items—which *the motion itself* (not the Court) characterized as "not evidence of a crime [or] proceeds of a crime"—with the notation "allowed, no opposition." Moreover, a state court's determination does not control the admissibility of evidence in federal court:

federal law governs the admissibility of evidence in federal prosecutions.... As a result, [e]vidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings *without regard to state law.* United States v. Charles, 213 F.3d 10, 19 (1st Cir.2000) (citation and internal quotation marks omitted) (alterations in original).

We also reject McGauley's contention that the district court erred in not letting her cross-examine government witnesses about the State Police's return of the merchandise to McGauley. The district court acted within its discretion in making "the overarching determination that we're not going to try the [state court] case."

## C. Specific Acts of Shoplifting

■ McGauley also objects to evidence that she committed three specific acts of shoplifting: the incidents at Macy's, TJ Maxx, and Ragg Time. McGauley ascribes "little or no probative value" to the events, because they did not involve the mails, and because the Macy's (1996) and TJ Maxx (1992) incidents were too remote in time. Once again, McGauley's argument fails because the indictment includes an allegation, necessary for a mail fraud conviction, that she engaged in a scheme to defraud that involved shoplifting large quantities of merchandise. Evidence tending to show that McGauley shoplifted on three separate occasions is highly probative of the "scheme to defraud" element of mail fraud.[8] Her unpersuasive claim that the

shoplifting incidents themselves did not involve the mails focuses on one piece of the scheme in isolation, ignoring the mailings that were central to its success. Her claim that the Macy's and TJ Maxx incidents are too remote in time is likewise without merit. Each occurred within the timeframe of the execution of the scheme.

## D. McGauley's Statement to the Police

■ We are equally unconvinced by the argument for the exclusion of Trooper Knott's testimony that McGauley had said that she had a "shopping disorder" and that "[s]he said she had a problem with kleptomania and she couldn't control herself." [9] That the statements were made "during the investigation of an unrelated crime for which [she] was not charged in the present indictment" does not affect their admissibility as evidence of the shoplifting element of the mail fraud scheme. Nor is there any basis in the record for McGauley's claim that her statement "was of no direct proof of a common 'scheme' as it related only to one charged offense (the alleged switching of the price tag on the green sweater)." It defies common sense to suggest that her unqualified statement that "she had a problem with kleptomania and she couldn't control herself" was in reference to one isolated incident. Nor does the outcome of the state court proceedings against McGauley in connection with the statements affect their admissibility in federal court.[10] *See Charles,* 213 F.3d at 19.

---

**8.** For the same reason, we reject McGauley's argument for the exclusion of testimony, based on state police surveillance conducted on July 9, 1997, about the price-tag-switching episode at Ragg Time.

**9.** McGauley made a pre-trial motion to exclude these statements as involuntary and in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). While

McGauley's brief suggests, in passing, that the district court's denial of her motion was "incorrect," she does not pursue the issue on appeal. In any event, her arguments are meritless.

**10.** McGauley declares that she was "not found guilty [in state court] of the charged offense for which she made this statement." She cites the testimony of Trooper Knott, who

## IV. The Forfeiture Instruction

McGauley was ordered to forfeit $243,087.42 to the United States, pursuant to 18 U.S.C. § 982(a)(1). She argues that the evidence warranted, at most, forfeiture of $55,296.28, the total amount of refund checks she received through her mail fraud scheme, according to the government's proof, and that the legitimate funds she commingled with those refund checks are not subject to forfeiture under § 982. McGauley objects to the district court's refusal to adopt her proposed instruction to the jury that "[t]he government is entitled *only* to funds used in the [mail fraud] offense, not the whole bank account into which such funds had been deposited" (emphasis in original).[11] When an alleged error in a jury instruction turns on a question of law, our review is de novo.[12] *United States v. Pitrone,* 115 F.3d 1, 4 (1st Cir.1997).

The district court rejected McGauley's proposed instruction. Instead, the court drew upon the terms of the money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(i), and the forfeiture statute, 18 U.S.C. § 982(a)(1), and instructed the jury that the scope of the forfeiture could exceed the amount of the refund checks, if it found that additional funds were "traceable to" or "involved in" the money laundering offense:

> You will attempt to trace the monies that were involved in the mail fraud scheme, and then you will ask yourself were any other monies involved in the money laundering....
>
> [The forfeiture statute] says that property involved in the ... money laundering offense, can include monies beyond the precise proceeds if it's used to facilitate the money laundering offense. When we talk about facilitation, we're talking about the circumstance in which property is used to make the prohibited conduct—that is, the money laundering—less difficult or more or less free from obstruction or hindrance or detection....
>
> Just because you comingled some dirty funds in an account that has clean funds in it doesn't mean that you forfeit the entire account. But forfeiture of

---

indicated that McGauley was charged with "shoplifting by price tag swapping" in state court, and "pled sufficient facts to the charge" (a "continuance without a finding").

11. McGauley also requested an instruction stating that "[t]he government is not entitled to forfeiture of funds having no previous connection to the illegal activity. Funds that have merely an incidental or fortuitous connection with the illegal activity are not forfeitable."

12. In a frivolous argument, McGauley also objects to the district court's instruction to the jury on direct and circumstantial evidence. The district court said: "a scheme to defraud need not be shown simply by direct evidence. It can be shown by circumstantial evidence, but it must be established by all of the facts and circumstances in this case." McGauley's proposed instruction would have required "direct evidence that these particular items that were returned had been stolen." Not surprisingly, she offers no support for the proposition that direct evidence is required for a mail fraud conviction.

Nor is there any merit to McGauley's contention that the government shifted the burden of proof onto her when it declared in its closing argument that she had "returned more than $55,000 to stores and not one receipt was recovered or presented here because there are none." McGauley observes that "[a] defendant is under no obligation to affirmatively produce exculpatory evidence[,] and the Government may not shift the burden of proof to the defendant." We do not share her view, however, that the government somehow shifted the burden of proof onto her with the simple observation, consistent with the evidence, that no evidence of sales receipts had been discovered or produced at trial.

legitimate and illegitimate funds comingled in an account is proper as long as the Government demonstrates to you ... that the defendant pooled the funds, comingled the funds, moved the funds to facilitate—that is, to disguise the nature or the source or the location of the funds.

The jury was instructed, in other words, that the commingling of tainted funds (mail fraud proceeds) with legitimate funds is enough to expose the legitimate funds to forfeiture, if the commingling was done for the purpose of concealing the nature or source of the tainted funds (that is, if the commingling was done to facilitate money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i)).

The key language in the district court's instruction tracked the text of 18 U.S.C. § 982(a)(1): [13]

The court, in imposing sentence on a person convicted of an offense in violation of ... section 1956 [the money laundering statute] ... shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

The district court relied on *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir.1998), in which the Tenth Circuit declared that "forfeiture of legitimate and

illegitimate funds commingled in an account is proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the nature and source of, his scheme." [14] The Fifth Circuit came to the same conclusion in a case where mail fraud proceeds had been commingled with legitimate funds:

All of the funds—both legitimate and illegitimate—were quickly moved into the account within a few days in order to conceal the nature and source of the mail fraud proceeds. Faced with such evidence, the jury was entitled to infer that all of the funds in the account were "involved in" the money laundering and subject to forfeiture pursuant to § 982.

*United States v. Tencer*, 107 F.3d 1120, 1135 (5th Cir.1997); *see also United States v. Baker*, 227 F.3d 955, 970 n. 4 (7th Cir. 2000) (noting that "even legitimate funds that are commingled with illegitimate funds can be forfeited if the legitimate funds were somehow involved in the offense, such as by helping to conceal the illegal funds").

 McGauley argues that the laundering of $55,296.28 in proceeds of unlawful activities does not warrant the forfeiture of $243,087.42 contained in her bank accounts at the time of the pro-

---

**13.** The terms "involved in" and "traceable to" are also found in the civil forfeiture provision, 18 U.S.C. § 981(a)(1). We look to cases under both § 981 and § 982 for guidance in interpreting these terms.

**14.** The idea that §§ 981 & 982 extend to funds that "facilitate" money laundering was first advanced in *United States v. All Monies ($477,048.62) in Account No. 90–3617–3*, 754 F.Supp. 1467 (D.Haw.1991). The court concluded that "18 U.S.C. § 981(a)(1)(A) applies to all property that facilitates violations of §§ 1956 and 1957. Even though § 981 does not expressly include the words 'facilitate' or

'facilitating,' the statute covers property 'involved in' illegal money laundering transactions. The legislative history makes it clear that 'property involved in' includes property used to facilitate money laundering offenses." *Id.* at 1473 (citation omitted). It cited the following statement in the legislative history: "[T]he term 'property involved' is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." 754 F.Supp. at 1473 (quoting 134 Cong. Rec. S17365 (daily ed. Nov. 10, 1988)).

scribed transactions.[15] However, the one reported case she cites in support of her proposed instruction does not advance her cause. The Seventh Circuit has indeed said that "the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water." *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir.1992). In that case, however, the government argued that the disputed funds were *proceeds of* unlawful activity, not that the funds were *involved in* unlawful activity, as the government argued here. Moreover, the Seventh Circuit has since endorsed the theory on which the district court instructed the jury.[16] *Baker*, 227 F.3d at 970 n. 4 (observing that legitimate funds commingled with illegitimate funds can be forfeited if used to conceal the illegitimate funds). We therefore conclude that the evidence supported a finding that the entire $243,087.42 was "involved in" the money laundering transactions within the meaning of 18 U.S.C. § 1956. The jury, properly instructed, made such a finding. Consequently, that entire sum was subject to forfeiture. *Bornfield*, 145 F.3d at 1135.

**Affirmed.**

---

**15.** McGauley's initial argument is that the forfeiture should be limited to the amount of the specific refund checks charged in the indictment (approximately $6,000). However, § 982 authorizes forfeiture of any property involved in or traceable to money laundering, and a money laundering conviction does not require that the underlying unlawful activities be charged in the indictment. *See supra; Baker*, 227 F.3d at 968–69 (forfeiture not limited to amount of specific transactions charged in indictment).

**16.** We also note that the forfeiture in *$448,342.85* was upheld, making the statement McGauley cites dicta. 969 F.2d at 477.